2025 IL App (2d) 240513
No. 2-24-0513
Opinion filed December 29, 2025
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-1769 |
| DARRYL E. HOLMAN, | ) ) ) | Honorable Elizabeth K. Flood, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justices McLaren and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Darryl E. Holman appeals his conviction for theft from a person (720 ILCS 5/16-1(b)(4) (West 2022)) and sentence of six years' imprisonment. For the following reasons, we affirm.

¶ 2                                  I. BACKGROUND

¶ 3     Defendant was charged and tried on two counts of aggravated battery (bodily harm on a public way and physical contact on a public way), robbery, and theft from a person, arising out of

an incident that occurred on July 19, 2021, in which he allegedly struck Gerald Wayne Darrough[1] and took the keys to his apartment.

¶ 4                                    A. Motions *in Limine*

¶ 5     On May 2, 2023, the State filed a motion *in limine* under Illinois Rule of Evidence 609 (eff. Jan. 6, 2015) seeking to admit defendant's prior convictions of armed violence in Kane County case No. 08-CF-487 and aggravated driving under the influence in Kane County case No. 17-CF-1617 for the purpose of impeaching defendant's credibility. A hearing was held on the State's motion on May 11, 2023.

¶ 6     At the hearing, the State argued that defendant had been released from prison on July 21, 2017, in case No. 08-CF-487, which, for the purpose of applying Rule 609, was less than 10 years before the hearing. Likewise, defendant's conviction in case No. 17-CF-1617 occurred in 2017 and was also within the last 10 years. The State argued that, based on defendant's criminal history, the State should be able to admit evidence of those convictions to impeach defendant in the event he chose to testify. Defendant argued that the potential prejudice from the convictions outweighed their probative value and that they should not be admitted. In arguing, defense counsel stated regarding defendant's armed violence conviction,

> "I do agree with the State that the other portions of the Illinois 609 are met, as it's a felony and it's less than 10 years has elapsed since he was released from confinement ***.
>
> So I would ask the Court to deny the State's motion and, in particular, the armed violence which cannot be admitted to a juror without them considering or making the

---

[1]We refer to him as Wayne throughout, as that is how most witnesses referred to him.

implication that a prior crime of violence begets a new crime of violence and that he is more likely to have participated in that aggravated battery.

So I would ask the Court to keep that armed violence out."

The trial court denied the State's motion as to defendant's armed violence conviction and granted the State's motion as to defendant's aggravated driving under the influence conviction.

¶ 7                                    B. Jury Trial

¶ 8     The matter then proceeded to a jury trial. The State first called Paul Drane, who testified as follows: Drane was 63 years old and lived in Aurora, where he worked at a grocery store. When Drane first moved to Aurora, he was homeless and lived at Wayside Ministry. Drane was friends with Gerald Darrough, who most people called "Wayne" and who lived in the neighborhood. Drane identified a photograph of Wayne, which was admitted into evidence. Drane met defendant at Wayside Ministry but did not know him "very very well." Drane identified defendant in court.

¶ 9     In July 2021, Drane was still living at Wayside Ministry. Wayne lived in a one-room apartment nearby. On the evening of July 19, 2021, Wayne and Drane were "hanging out drinking and stuff." The two went to For More Liquors[2] on Broadway and Washington Street in Aurora. Wayne sat outside on the corner of Broadway and Washington Street, while Drane went inside to buy a six-pack of beer. When Drane exited the store, he saw Wayne "[get] jumped on" by defendant on the corner of Broadway and Washington Street, across from the liquor store. Defendant accused Wayne of taking his backpack, knocked Wayne down, "and just jumped on his chest. He just kept on beating him, beating him." Drane testified that defendant hit Wayne in the

_____

[2]Drane and others sometimes erroneously referred to the liquor store as "Foremost Liquors," which is a chain liquor store that does have a location in Aurora. However, it is undisputed that the events at issue took place in the vicinity of For More Liquors.

head and gestured toward his eye sockets as he did so. Wayne was ultimately knocked unconscious.

¶ 10    Drane walked halfway across the street, but was afraid to say anything, because he did not want to get jumped himself. Drane then walked away, not wanting to get involved. He observed two women nearby, one named Julie and another whom he did not know by name but whom he had seen in court earlier that day. Drane did not see what happened to Wayne and did not see Wayne again afterward. Drane did not call the police because he did not have a cell phone. Drane then identified two photographs of the liquor store and one photograph of a nearby railway overpass, which were admitted into evidence.

¶ 11    The State also called Detective Benjamin Grabowski of the Aurora Police Department, who testified as follows: On July 28, 2021, Grabowski spoke with Julie Witt at the Aurora Police Department, and Witt provided Grabowski with a piece of mail addressed to "Gerald W Darrough" at 316 S LaSalle Street, Aurora, Illinois, 60505. A photograph of the piece of mail was admitted into evidence. Grabowski learned that Wayne had been admitted to Amita Mercy Hospital on July 19, 2021. On July 30, 2021, Grabowski went to 316 S LaSalle Street, which was a single-family home that had been converted into a boarding house. There, Grabowski spoke with Jim Larson, who owned the building, and Dave Raspiller, one of the tenants. Grabowski showed Raspiller a photograph of defendant, whom Raspiller identified as the man he had seen going in and out of apartment D during the past week. Grabowski identified several photographs of the area surrounding For More Liquors, including an overpassing train track on the opposite end of the block.

¶ 12    Grabowski went to For More Liquors and obtained permission from the clerk to review footage from the business's security cameras. There was an interior camera that recorded

continuously and an exterior camera that recorded when it detected motion. Grabowski copied footage from the exterior recordings onto a USB thumb drive, and that footage was admitted into evidence and played for the jury. The footage covered the sidewalk adjacent to the south side of the building to just beyond the sidewalk on the opposite side of Washington Street. The footage was timestamped and begins at 9:53 p.m.[3] Because the recording is motion-triggered, there are gaps in the footage from when the camera was not recording. Grabowski testified that the exterior camera's motion detection extended partway into the street on Washington Street, such that it would detect someone walking on the sidewalk adjacent to the building, but not necessarily someone in the grassy area across the street. This is apparent from the footage in which the recording stops, despite people moving in the area across the street.

¶ 13    At the 9:56:15 p.m. mark, Wayne can be seen walking toward the curb on the far side of Washington Street, though only his legs are visible. The footage then jumps forward to 9:57:20 p.m., and Wayne can be seen sitting on the curb with his feet extending into the street. Drane can be seen talking with him. The footage stops at 10:01:28 p.m., with Drane standing near Wayne. The footage then jumps to 10:03:01 p.m. Wayne is now lying down on his back, and Drane can be seen walking into frame to pick up a bottle from beside Wayne. The footage then jumps from 10:03:16 p.m. to 10:04:39 p.m. Wayne is still lying down, and Drane is standing near him. Drane reaches down for something and walks out of frame. The footage then jumps from 10:05:10 p.m. to 10:05:27 p.m. A reflection on a parked car shows Drane crossing the street toward the liquor store. The footage then jumps several more times, with multiple customers going to and from the

---

[3]Grabowski testified that the timestamp was an hour behind, so the video itself incorrectly reflects the time as 8:53 p.m.

liquor store. Wayne appears to stay in nearly the exact same position from 10:04:39 p.m. to 10:35:31 p.m., and no one can be seen approaching him. At 10:39:46 p.m., three men appear to be helping Wayne out of the street and carrying him to the grass on the opposite side of the sidewalk, barely visible in frame. At 10:48:33 p.m., a police car pulls onto Washington Street, followed shortly thereafter by an ambulance. At 10:56:10 p.m., the ambulance and police leave. At no point in the video is defendant visible.

¶ 14    On September 10, 2021, Grabowski interviewed defendant. The interview was video recorded, and a portion of that interview and transcript were admitted into evidence. In the interview, Grabowski showed defendant a photograph of Wayne, and defendant acknowledged that he knew Wayne and claimed that they were friends.

¶ 15    On cross-examination, Grabowski acknowledged that he first learned about the alleged assault on Wayne from Julie Witt and that the initial 911 call regarding Wayne did not indicate that he had been assaulted.

¶ 16    Julie Witt testified that she met defendant a few months before July 2021. At the time, Witt and defendant were both homeless. On July 19, 2021, she was staying at a friend's house. Defendant came over, and they went to get beer from For More Liquors. After getting the beer, Witt and defendant went to sit and drink under the railway overpass on Broadway and Clark Street, north of the liquor store. Witt and defendant were sitting on the south side of Clark Street when a man came near. Defendant then "ran up and punched this guy one time, just laid him out on the ground." Witt clarified that defendant struck the man in the face. Witt wanted to go and see if the man was alright, but defendant would not allow her to. As the man lay unconscious, defendant went through his pockets and took a set of keys. Defendant then told Witt to grab her things and stated, "let's go." Defendant hit her when she did not gather her things fast enough.

¶ 17    Defendant and Witt then went to the apartment at 316 S LaSalle Street and entered apartment D with a key. They stayed there for two nights. At some point, someone knocked on the door, and defendant told Witt to be quiet because they were not supposed to be there. After two nights, Witt left the apartment. She accidentally grabbed a piece of mail that was on the floor when she went to collect the contents of her purse and later gave the piece of mail to Grabowski.

¶ 18    On cross-examination, Witt clarified that the man defendant hit was Black (Wayne was also Black) and that defendant hit him under the overpass on Clark Street, not in the grassy area on the south side of Washington Street.

¶ 19    Shawn Hage testified that he was a firefighter and paramedic with the Aurora Fire Department. Hage examined Wayne at the scene and transported him to the hospital. He did not have any independent recollection of examining Wayne and relied on his report of the incident. When he arrived at Washington Street, he saw a man face down in the grass. The man was later identified as Wayne. He did not respond to verbal stimuli and had to be moved or touched to get a reaction. Hage testified that when he arrived, he would have likely done a brief trauma assessment.

¶ 20    On cross-examination, Hage testified that Wayne smelled of alcohol and there was alcohol paraphernalia near where he was found. Hage identified the grass near Washington Street as where Wayne was picked up and stated that he had not found Wayne near the overpass on Clark Street. Hage explained that he did a "quick evaluation" for trauma and did not see any signs of trauma and that his primary impression was that Wayne was intoxicated. On redirect examination, Hage explained that his evaluation for trauma would not have involved removing clothes; thus, there might have been indicators he had not seen.

¶ 21    The State next called James Larson, who testified that he owned the apartment building at 316 South LaSalle Street. Larson explained that the property included four rooms that were rented

and an apartment on the first floor. The front door and unit doors locked automatically. Wayne was one of Larson's tenants in 2020 and 2021. Wayne was given one set of keys, which included a key to the front door and a key to his room. Tenants were not allowed to let anyone else stay in their rooms. Wayne had understood this and had not had anyone else stay in his room. The last time Larson saw Wayne was July 19, 2021. He later learned from Wayne's sister that he had been in the hospital. Larson had not known Wayne to have any physical or mental disabilities.

¶ 22    The State next called David Raspiller Jr., who testified as follows: Raspiller lived at 316 South LaSalle Street and also served as property manager. He met Wayne when he moved into the apartment and had a good rapport with him. He would see Wayne nearly every day. On July 30, 2021, Raspiller spoke with Grabowski. It had been some time since Raspiller had seen Wayne in the building, but Raspiller had seen a man coming and going from Wayne's room around that time. Raspiller tried to talk to the man, but he was evasive and would hurry back to Wayne's room when confronted. There was also "a girl or two" staying with the man, but Raspiller did not try to speak to them. Raspiller made an in-court identification of defendant as the man he had seen.

¶ 23    The State then rested.

¶ 24    The defense presented a certified copy of a Cook County conviction for Drane of a 2016 attempted burglary and then rested.

¶ 25    In closing argument, defendant argued that Witt lied about witnessing the assault on Wayne, as Wayne was demonstrably not assaulted under the overpass, as the surveillance footage showed that he remained on Washington Street. Further, defendant argued that Paul Drane was the one who assaulted Wayne, arguing that Drane can be seen in the surveillance footage with Wayne and appears to go through Wayne's things. Defendant went on to argue that Drane gave Wayne's keys to Witt and told her to tell the police that defendant beat up Wayne.

¶ 26    In rebuttal, the State made the following argument:

"MR. RODGERS [(ASSISTANT STATE'S ATTORNEY)]: So the defense's theory apparently at this point has become that it was Paul Drane. Paul Drane was the guy, so that's what you have to decide. Was it Paul Drane or was it Gerald Darrough [*sic*]?

MR. SPARKS [(DEFENSE ATTORNEY)]: I object, that misstates the burden here.

THE COURT: Overruled.

* * *

MR. RODGERS: Was it Paul Drane, the guy who was in a video, and that's literally it. That is literally the only evidence that you have connecting Paul Drane to Gerald Darrough. Or was it the guy who was in his house, the guy who was ID'd by two eyewitnesses who saw him attack Gerald. That's what you have to decide, and in that sense, this case is very simple."

¶ 27    After deliberating, the jury returned a verdict of not guilty as to the aggravated robbery and battery charges, and guilty as to the charge of theft from a person.

¶ 28                    C. Posttrial and Sentencing

¶ 29    On June 12, 2023, defendant filed a motion for a new trial, arguing that the trial court erred in admitting defendant's statements to Grabowski and that the prosecution shifted the burden of proof when it argued that the jury had to choose between the State's and defendant's versions of events.

¶ 30    A hearing was held on defendant's motion for a new trial on June 23, 2023. The trial court denied the motion and proceeded to sentencing. The State presented two pieces of evidence: a victim impact statement from Wayne's sister and a police synopsis from Kane County case No. 08-

CF-487, in which defendant was convicted on August 29, 2008, of armed violence and aggravated battery, which were committed on February 16, 2008. The defense presented no evidence.

¶ 31 The State argued that defendant was extended-term eligible, based on defendant's conviction in Kane County case No. 08-CF-487, for which defendant was released from Illinois Department of Corrections custody on July 21, 2017. The State argued that applicable factors in aggravation included that defendant had a history of prior criminal activity and that a strong sentence was required to deter others from committing the same crime. The State maintained that the court should not consider defendant's conduct to have neither caused nor threatened serious physical harm to another, despite the jury's not guilty verdict as to the aggravated battery and robbery charges. The State recommended an eight-year sentence.

¶ 32 The defense argued that, as the jury had acquitted defendant of the aggravated battery and robbery charges, the court should consider as factors in mitigation that defendant's criminal conduct neither caused nor threatened serious physical harm to another and that defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another. The defense recommended a sentence of two to three years.

¶ 33 The court found defendant to be extended-term eligible and sentenced him to six years' imprisonment. The court found that defendant's criminal history was a factor in aggravation, noting "that the only long amounts of time in which the defendant was not committing crimes is when he has been incarcerated" and that when defendant had been placed on parole, he was readmitted to the Department of Corrections on six occasions. Further, when interviewed as part of his presentence investigation, defendant stated that he did not want to be on probation because he felt he was too old to have someone micromanage his life. The court likewise found that the

sentence was necessary to deter others. Regarding factors in mitigation, the court gave the following statement:

"As factors of mitigation, this Court did sit through the entire trial and heard the testimony of the witnesses.

Although the defendant was found not guilty of robbery and aggravated battery, the burden of proof is beyond a reasonable doubt.

I do not believe that the Court is required to find that, simply because a jury did not find the defendant guilty beyond a reasonable doubt of aggravated battery, that, the converse of that, that the Court needs to find the defendant's conduct did not cause or threaten serious harm.

Again, even in the light most favorable, although that's not exactly the correct way to say it, but even interpreting the facts as the jury may have interpreted them to be that the defendant took the keys of someone who was passed out and injured and then left him there, even that appears to at least not mitigate any harm to the victim, if not make it worse.

So I'm not going to find that that is a factor in mitigation that the defendant's conduct did not cause or threaten serious physical harm to the victim.

There were not other factors in mitigation that were argued by the defense."

¶ 34    Defendant timely appealed.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal defendant raises three issues: (1) whether the trial court violated defendant's fifth and sixth amendment rights (U.S. Const., amends. V, VI) by sentencing him to an extended-term sentence without submitting to the jury the factual questions necessary to determine whether he was extended-term eligible; (2) whether the trial court considered an improper factor in

sentencing, where, instead of finding that defendant's conduct did not cause or threaten serious harm, the trial court found that he did not "mitigate any harm to the victim"; and (3) whether defendant was denied a fair trial by the State's remarks in closing argument that the jury had to decide between the defense's theory that Drane assaulted Wayne, or the State's theory that defendant assaulted Wayne, thereby shifting the burden of proof.

¶ 37                                  A. Extended-Term Sentence

¶ 38    Defendant maintains that under the United States Supreme Court's recent decision in *Erlinger v. United States*, 602 U.S. 821 (2024), the trial court's failure to submit the question of his extended-term eligibility to the jury violated his constitutional rights to due process and trial by jury.

¶ 39    As a preliminary matter, the State argues that defendant should be barred from raising this argument under the doctrines of judicial estoppel and invited error. Further, the State maintains that the defendant forfeited the issue when he failed to file a motion to reconsider sentence.

¶ 40    Regarding invited error, the State maintains that defendant invited the error by requesting that the trial court not submit defendant's convictions to the jury for the purpose of impeachment and now arguing that the State needed to present the convictions to a jury for sentencing. Under the doctrine of invited error, "a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). We disagree with the State that the doctrine of invited error applies. Defendant objected to the State's motion to admit his prior convictions pursuant to Illinois Rule of Evidence 609 (eff. Jan. 6, 2015) to impeach his credibility. The trial court denied the State's motion as to defendant's armed violence

conviction. The issue of whether that conviction should be presented to the jury for purposes of establishing defendant's eligibility for extended-term sentencing is a separate issue, which was never raised or considered. Accordingly, defendant did not invite the claimed error when he objected to the State's motion *in limine*.

¶ 41 Regarding the State's forfeiture argument, forfeiture is a limitation on the parties and not the reviewing court, and we may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent. *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15. Similarly, "[j]udicial estoppel is an equitable doctrine invoked by the court at its discretion." *Seymour v. Collins*, 2015 IL 118432, ¶ 36. The issue raised by defendant involves the application of recent United States Supreme Court precedent to Illinois law; thus, to maintain a sound body of precedent, we decline to apply the doctrines of forfeiture and judicial estoppel.

¶ 42 Turning to the merits, based on defendant's conviction for armed violence in Kane County case No. 08-CF-487, the trial court found defendant eligible for an extended-term sentence under section 5-5-3.2(b)(1) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(b)(1) (West 2022)). To be extended-term eligible under section 5-5-3.2(b)(1), the defendant must have been convicted of the same, similar, or greater class of felony within the last 10 years, excluding time spent in custody. *Id.* "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

¶ 43 Defendant maintains that following *Erlinger*, the question of whether defendant's prior conviction occurred within the last 10 years is a question of fact beyond the mere fact of a prior conviction and, therefore, needed to be proven to a jury beyond a reasonable doubt.

¶ 44    The *Erlinger* Court considered the application of the fifth and sixth amendments to the federal statute commonly referred to as the Armed Career Criminal Act (18 U.S.C. § 924(e)(1) (2012)). *Erlinger*, 602 U.S. at 825. Erlinger was charged with being a felon unlawfully in possession of a firearm under section 922 (18 U.S.C. § 922(g) (2012)), which normally carried a maximum sentence of 10 years. *Erlinger*, 602 U.S. at 825. However, under the Armed Career Criminal Act, the minimum sentence for a defendant who had "three previous convictions *** for a violent felony or a serious drug offense, or both, committed on occasions different from one another" was 15 years. 18 U.S.C. § 924(e)(1) (2012). The question considered by the Supreme Court was, "whether a judge may decide that a defendant's past offenses were committed on separate occasions under a preponderance-of-the-evidence standard, or whether the Fifth and Sixth Amendments require a unanimous jury to make that determination beyond a reasonable doubt." *Erlinger*, 602 U.S. at 825. Erlinger pled guilty to the charge of being a felon in possession of a weapon. *Id.* at 826. At sentencing, the government maintained that 26 years before the charge at issue, Erlinger burglarized a pizza shop, a sporting goods store, and two restaurants "within a span of days." *Id.* Erlinger maintained that the burglaries represented "a single criminal episode." *Id.* at 827. Erlinger further maintained that the question of whether the prior burglaries were committed on separate occasions should be submitted to a jury. *Id.* The trial court rejected Erlinger's request for a jury and found that the burglaries occurred on distinct occasions in satisfaction of the Armed Career Criminal Act. *Id.* The Supreme Court held that "deciding whether those past offenses occurred on three or more different occasions is a fact-laden task" (*id.* at 834) and, therefore, Erlinger "was entitled to have a jury resolve [the Armed Career Criminal Act's] occasions inquiry unanimously and beyond a reasonable doubt." *Id.* at 835.

2025 IL App (2d) 240513

¶ 45    By contrast, defendant here was found eligible for an extended-term sentence, based on a single felony conviction. The mere fact of this conviction does not need to be submitted to a jury. See *Apprendi*, 530 U.S. at 490. Defendant argues, however, that a jury should have determined whether the conviction "occurred within 10 years after the previous conviction, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts[.]" 730 ILCS 5/5-5-3.2(b)(1) (West 2022).

¶ 46    Having considered *Erlinger*, we do not believe that it requires the matter of defendant's prior convictions under section 5-5-3.2(b)(1) of the Unified Code of Corrections to be submitted to a jury. First, the requirements of section 5-5-3.2 present a much simpler inquiry than those presented by the Armed Career Criminal Act and can be readily discerned by review of public records or the presentence investigation. Second, the Supreme Court made it clear that its decision in *Erlinger* did not overturn or narrow the holdings in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), and *Apprendi*, 530 U.S. 466. *Erlinger*, 602 U.S. at 835, 838 ("Really, this case is as nearly on all fours with *Apprendi* ***." "Still, no one in this case has asked us to revisit *Almendarez-Torres*."). Further, Illinois courts have repeatedly held that section 5-5-3.2(b)(1) is constitutional under *Apprendi*. See, *e.g.*, *People v. Johnson*, 372 Ill. App. 3d 772, 781 (2007); *People v. James*, 362 Ill. App. 3d 285, 293 (2005); *People v. Blanks*, 361 Ill. App. 3d 400, 414 (2005).

¶ 47    Our Third District and several other foreign state courts with similar sentencing statutes have already rejected the proposition that *Erlinger* requires the date of a prior conviction to be submitted to a jury. *People v. Coopwood*, 2025 IL App (3d) 240579-U, ¶ 19; *Denson v. State*, 401 So. 3d 633, 633-34 (Fla. Dist. Ct. App. 2025) (*per curiam*); *People v. Jackson*, 225 N.Y.S.3d 903, 910 (Sup. Ct. 2025); *State v. Calvert*, 564 P.3d 814, 819-20 (Kan. Ct. App. 2025). We hold that

the date of defendant's release from custody is not a fact that must be submitted to a jury but is "intrinsic to the conviction" and can be properly determined by the court. See *People v. Yancy*, 368 Ill. App. 3d 381, 393 (2005). Further, we note that courts may take judicial notice of the public records of the Illinois Department of Corrections regarding the dates of a conviction and release from custody. *People v. Sanchez*, 404 Ill. App. 3d 15, 17 (2010).

¶ 48 Accordingly, we reject defendant's argument and affirm the trial court's judgment finding defendant extended-term eligible under section 5-5-3.2(b)(1) of the Unified Code of Corrections.

¶ 49                                B. Sentencing Factors

¶ 50 Defendant argues that the trial court erred when it failed to consider whether his conduct caused or threatened serious harm and, instead, improperly found that defendant had a duty to help the victim and weighed defendant's failure to help against him.

¶ 51 As an initial matter, the State argues that defendant forfeited this argument when he failed to file a motion to reconsider sentence. To preserve an issue for review, a defendant must both object at trial and raise the issue in a written posttrial motion; failure to do so results in forfeiture. *People v. Lewis*, 223 Ill. 2d 393, 400 (2006). We agree with the State that defendant has forfeited the issue.

¶ 52 Even setting forfeiture aside, the trial court did not err in its application of sentencing factors. Defendant's argument is essentially two-fold: (1) that the trial court considered an improper factor in sentencing (*i.e.*, the failure to mitigate harm to Wayne) and (2) that the trial court failed to give proper weight to the mitigating factor that defendant's criminal conduct neither caused nor threatened serious physical harm to another. Defendant asks that we reduce his sentence or remand for a new sentencing hearing per Illinois Supreme Court Rule 615.

¶ 53     A trial court abuses its discretion when it considers an improper factor in aggravation, and the question of whether a factor is improper is reviewed *de novo. People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 55. "A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "Nonetheless, there is a strong presumption that the trial court's sentence was based on proper legal reasoning, and a reviewing court should consider the record as a whole rather than a few isolated statements." *Musgrave*, 2019 IL App (4th) 170106, ¶ 55. Likewise, "[t]here is a presumption that a trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors." *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010).

¶ 54     We disagree with defendant's assertion that the trial court considered an improper factor when it remarked that defendant's behavior did "not mitigate any harm to the victim." The court's remark was clearly made in the context of defendant's argument that his conduct did not cause or threaten serious harm and, therefore, should be considered as a factor in mitigation. Defendant's argument at sentencing was that the jury's "not guilty" verdicts as to the charges of robbery and aggravated battery meant the court should find mitigation existed. The trial court disagreed that the verdicts had such an effect.

¶ 55     Further, in making its ruling, the trial court clearly considered the effect of the jury's "not guilty" finding on the aggravated battery charges, noting that, "in the best interpretation of the facts found by the jury, the victim appeared to be out cold and injured at the time that the defendant

then took his keys and left him and decided to use the victim's apartment for several days." The trial court then reiterated,

"[a]gain *** even interpreting the facts as the jury may have interpreted them to be that the defendant took the keys of someone who was passed out and injured and then left him there, even that appears to at least not mitigate any harm to the victim, if not make it worse."

This statement is not tantamount to imposing an improper factor in aggravation. The trial court's discussion focused on the circumstances of the crime and whether it would find that defendant's criminal conduct neither caused nor threatened serious physical harm as a factor in mitigation. "The most important sentencing factor is the seriousness of the offense." *Id.* at 159. This includes the nature and circumstances of the offense. *Id.* Moreover, the court's comment about not mitigating harm was not repeated or expanded upon elsewhere. Again, we look at the trial court's entire decision rather than a few isolated statements. *Musgrave*, 2019 IL App (4th) 170106, ¶ 55. Accordingly, we reject defendant's contention that the trial court applied an improper sentencing factor in aggravation.

¶ 56    Regarding the alleged failure to consider factors in mitigation, we agree with the trial court's assertion that the jury's finding of not guilty on the aggravated battery charges did not require the trial court at sentencing to find that defendant's conduct therefore did not cause or threaten serious harm. As the trial court noted, the burden of proof at trial is beyond a reasonable doubt, whereas the burden required at sentencing is lesser. See *People v. Jackson*, 149 Ill. 2d 540, 549 (1992) ("We need not decide now if any specific traditional standard of proof applies at sentencing. Important to our analysis here is that the burden of proof at sentencing is lower than proof beyond a reasonable doubt and that evidence received be relevant and reliable."). Accordingly, evidence of criminal conduct can be considered at sentencing even if the defendant

has been previously acquitted of that conduct, as an acquittal is not necessarily conclusive evidence that the defendant did not commit the alleged acts but merely that the government was unable to prove beyond a reasonable doubt that defendant committed them. *Id.* at 549-50.

¶ 57    In the instant case, Drane and Witt both testified that defendant struck Wayne, knocking him down, with Witt testifying that defendant stole Wayne's keys. In light of the trial evidence and the jury's verdict, the trial court's decision not to apply either factor (that defendant's conduct did or did not cause or threaten serious harm) was reasonable and, therefore, not an abuse of discretion.

¶ 58                                C. Burden Shifting

¶ 59    Defendant argues he was denied a fair trial because the State impermissibly shifted the burden of proof during rebuttal when the prosecutor stated that the jury must choose between the defense's theory implicating Drane and the State's theory implicating defendant. The State argues that the prosecutor's remarks were invited by the defense when counsel asked the jury whether it was more likely that Drane or defendant knocked out Wayne.

¶ 60    Prosecutors are allowed a great deal of latitude in closing argument and have the right to comment upon the evidence presented and upon reasonable inferences arising therefrom, even if such inferences are unfavorable to the defendant. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Likewise, a prosecutor may respond to comments by defense counsel that clearly invite a response. *Id.* Though a defendant may make a remark that invites a response from the State, a defendant in a criminal case can never open the door to shift the burden of proof. *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 65. "However, when '[t]he purpose' of the State's comments is not to shift the burden of proof, but to respond to the defendant's argument, error cannot normally be claimed." *Id.* (quoting *People v. Patterson*, 217 Ill. 2d 407, 446 (2005)).

¶ 61    The State maintains that the prosecution's remarks about having to decide between Drane and defendant were specifically responding to arguments the defense made in its closing and were not directed toward shifting the burden of proof. Most notably, defense counsel said to the jury,

> "So my question to you is who is more likely to have hit and knocked Wayne unconscious that night. Is it Darryl who is sitting here in court with me today who is not pictured in the video at all or Paul Drane himself who is both present and knows what is going on and identifies himself as the only individual in the vicinity of Wayne that evening?"

¶ 62    We agree with defendant that the prosecution misstated the burden of proof when the prosecution told the jury that it had to choose between Drane and defendant, as the jury did not have to find that Drane committed the crimes in order to acquit defendant. However, we agree with the State that the prosecutor's remarks were a direct and invited response to the defense's closing arguments—particularly, the defense's remarks regarding who was more likely to have committed the assault: defendant or Drane.

¶ 63    Further, the prosecution's remarks about having to decide between Drane and defendant were limited to sections quoted (*supra* ¶ 26) at the beginning of the prosecution's rebuttal, and the burden of proof was not further misstated. See *People v. Cloutier*, 178 Ill. 2d 141, 168 (1997) (prosecution's mischaracterization of the defendant's release from prison for accumulation of good-conduct credits as release on parole was harmless error where the remark was "isolated" and "not a major theme in the State's argument").

¶ 64    Additionally, the jury was properly instructed regarding the burden of proof and nature of closing arguments, and the jury is presumed to follow the instructions the court gives it. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995); see *People v. Quiroz*, 257 Ill. App. 3d 576, 585 (1993) (when a jury is instructed that closing arguments are not evidence and statements not based on the

evidence should be disregarded, "[s]uch instructions are deemed to protect defendant against most prejudices caused by a prosecution's improper comments"). As such, we find that the State's remarks were made in response to, and invited by, defendant's closing argument, not for the purpose of shifting the burden of proof to defendant.

¶ 65    Accordingly, we affirm the judgment of the trial court.

¶ 66                                    III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 68    Affirmed.

*People v. Holman*, **2025 IL App (2d) 240513**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 21-CF-1769; the Hon. Elizabeth K. Flood, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Dominique Estes, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |