2026 IL App (2d) 240700-U
No. 2-24-0700
Order filed June 24, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

RASHAAN WADE, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable David C. Lombardo, Judge, Presiding.
No. 17-CF-3251

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   There was no error, and thus no plain error, in defendant's sentence of 40 years for first-degree murder; the trial court's consideration in aggravation that defendant was armed during the offense was supported by reliable evidence; defendant cannot establish that he received ineffective assistance based on counsel's failure to object to that evidence at sentencing.

¶ 2    Following a jury trial, defendant, Rashaan Wade, was convicted of two counts of first-degree murder (720 ILCS 5/9-1(a)(2), (a)(3) (West 2016)). The trial court imposed a sentence of 40 years in prison, noting in aggravation that defendant "brought a firearm" to the scene and was "armed." On appeal, defendant asks that we reduce his sentence, or vacate it and remand for

resentencing, because the evidence relied on by the court to support its finding that defendant was armed was unreliable. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4      On December 11, 2017, defendant, along with three codefendants—Octavis Jones, Shajuan Garrett, and Gerard Wade (Gerard)—traveled together in Jones's vehicle to a Walmart parking lot to obtain cannabis from Michael Perrin and the victim, Jovan Dubose. On the way to Walmart, defendant and codefendants decided that they were going to rob Perrin and Dubose of the cannabis. Defendant and codefendants arrived at the parking lot before Perrin and Dubose, and Jones backed his vehicle into a parking spot. Perrin and Dubose arrived shortly thereafter in Perrin's vehicle. Perrin was driving and Dubose was in the front passenger seat. When Perrin pulled his vehicle into the parking lot, Garrett and defendant entered the backseat of Perrin's vehicle, and Perrin turned into a parking spot. Gerard approached the driver's side of Perrin's vehicle and pointed a gun at Perrin through the open driver's side window. Gerard claimed that Perrin had a gun and that Gerard tried to take it from him. Perrin's vehicle moved forward and crashed into a parked vehicle. Defendant and Garrett exited the backseat of Perrin's vehicle and ran, along with Gerard, back to Jones's vehicle. Dubose exited Perrin's vehicle and gave chase behind defendant. Garrett entered the front passenger seat of Jones's vehicle. As Gerard entered the back of Jones's vehicle, Perrin and defendant went to the ground. Dubose was shot. Defendant entered Jones's vehicle, and Jones drove away. Perrin also drove away, leaving Dubose behind. Dubose died at the scene.

¶ 5      On January 10, 2018, defendant and codefendants were indicted on three counts of first-degree murder: (1) intentional murder (*id.* § 9-1(a)(1)), (2) knowing murder (*id.* § 9-1(a)(2)), and (3) felony murder in the commission of an armed robbery (*id.* §§ 9-1(a)(3), 18-2(a)(2)). Prior to

defendant's trial, the codefendants each pled guilty to armed robbery and agreed to testify against defendant.

¶ 6     Defendant's jury trial took place over the course of three days in May 2024. Defendant raised an alibi defense, claiming to be in California at the time of the offense. The evidence consisted of eyewitness testimony, surveillance video from the Walmart parking lot, digital cell phone reports, social media records, phone call records, text messages, physical evidence (including a bullet casing recovered near Dubose, the firearm used to kill Dubose, and DNA recovered from Jones's car), autopsy results, and jail telephone call recordings. Relevant here is the testimony related to whether defendant was armed with a firearm at the time of the offense.

¶ 7     We summarize the relevant testimony. Perrin (30 years old) testified that, on December 11, 2017, he drove to Walmart with Dubose, who was sitting in the front passenger seat. When they entered the parking lot, two men (defendant and Garrett) entered the back seat of his vehicle. There was another man (Gerard) standing at the driver side of his vehicle. When asked what happened after defendant and Garrett entered his vehicle, Perrin stated: "Guns were drawn." When asked who drew the guns, Perrin stated: "One in the back of me and one on the outside of the car." When asked how many people drew guns, he replied: "I'm guessing three." Perrin testified that he and Dubose "fought back." He put his car in drive and crashed into someone's vehicle. "[Dubose] jumped out of the car." He then put his car in reverse and tried to find Dubose. He did not know where Dubose went. Perrin left the scene.

¶ 8     On cross-examination, Perrin acknowledged that he had previously been convicted of theft. He denied that he had a gun or that he went to Walmart to deal drugs. Perrin had never seen defendant before and was unable to identify him in court. Dubose was an athlete and was described as big.

¶ 9    Jones (28 years old) testified that he had gone to high school with defendant. On March 5, 2020, he pleaded guilty to armed robbery stemming from the events that occurred on December 11, 2017, and was sentenced to 17 years in prison to be served at 85 percent. As part of his plea, he agreed to testify against defendant. Jones testified that, on December 11, 2017, Jones picked Garrett up in his girlfriend's vehicle. They smoked "[w]eed" together in the vehicle. Garrett used Jones's phone and arranged to purchase more "weed." Garrett told Jones to pick up defendant because defendant "had the other half of the money." Garrett also called Gerard. Jones then picked up defendant and Gerard. Jones testified that defendant and Gerard entered the back of his vehicle; however, he could not recall who was sitting on which side. Jones testified that he saw Garrett and Gerard with a gun; he did not see defendant with a gun. Jones described Garrett's gun as "[a] little small handgun" that was "all black." He described Gerard's gun as a "pretty big *** black handgun."

¶ 10    Jones testified that he drove to Walmart. On the way there, Garrett brought up the idea that it was going to be a robbery. When they arrived at Walmart, Jones parked his vehicle and Garrett made a call to the people they were supposed to be meeting. Gerard exited the vehicle and walked toward the entrance of Walmart. When the other car arrived (Perrin's vehicle), Garrett and defendant exited Jones's vehicle and entered the back seat of Perrin's vehicle. Jones looked down at his phone and when he looked back up, he saw Gerard standing next to Perrin's vehicle. Jones saw Gerard reach inside the vehicle; he could not see if Gerard had anything in his hands. Jones looked down again, and when he looked back up, Garrett, Gerard, and defendant were running back to his vehicle. He saw somebody (Dubose) get out of the passenger side of Perrin's vehicle and he too was running towards Jones's vehicle.

¶ 11    According to Jones, "[Garrett] got in the passenger seat, [Gerard] ran on the other side, and [defendant] and whoever was behind him went down to the ground." Jones clarified that Garrett entered the front passenger seat as Gerard ran around to the driver's side but did not immediately enter. Defendant and Dubose made it to "about the back door," when "they went down and [Jones] heard a pop." Garrett was in the car with Jones when he heard the pop, which Jones believed to be "[a] gunshot." Gerard and defendant entered Jones's vehicle, and Jones drove away. Garrett had cannabis with him.

¶ 12    Garrett (24 years old) testified that he had been friends with defendant since he was 18 years old. Garrett "grew up with [Jones]" and was "not really familiar with [Gerard]." Garrett pleaded guilty to armed robbery stemming from the events of December 11, 2017, and was sentenced to 17 years in prison to be served at 85 percent. At the time of the offense, Garrett was on probation for a firearm offense. On December 11, 2017, Jones contacted Garrett and told him he was "trying to get some weed." Jones picked up Garrett who then entered the front passenger seat. Jones next drove to North Chicago to pick up Gerard and defendant. Gerard and defendant entered the back seat of Jones's vehicle, but Garrett did not remember where each individual was seated. Jones drove to Walmart and parked. Perrin's vehicle arrived "[a] couple minutes" later. Garrett did not know Perrin or Dubose.

¶ 13    Garrett testified that when Perrin's vehicle arrived, Garrett, defendant, and Gerard exited Jones's vehicle. Jones remained in his vehicle. Garrett and defendant entered the backseat of Perrin's vehicle. Garrett did not remember which side of the vehicle he entered. Garrett did not know where Gerard went. According to Garrett, Perrin and Dubose gave them the cannabis. Gerard approached the driver's side window and "pulled a gun out." When asked whether any other firearms were pulled out at that time, Garrett responded, "I don't know." Garrett recalled being

interviewed by Detective Alejos Villalobos on May 3, 2023, but did not recall telling him that defendant and Gerard had firearms during the robbery.

¶ 14　Garrett testified that when he saw the firearm, he exited Perrin's vehicle, ran back to Jones's vehicle, and entered the front passenger seat. Garrett did not recall where defendant and Gerard went. He did not recall what they took from Perrin and Dubose. Garrett did not recall telling Villalobos on May 3, 2023, that, while in Jones's vehicle, Gerard was sitting behind Jones and defendant was sitting behind Garrett. Garrett did recall telling Villalobos that he saw defendant outside of Jones's vehicle after he had already entered. He also recalled telling Detective Villalobos that that was when he heard a pop. When asked what the pop was, he agreed that it was "[p]robably" a gunshot. Garrett could not recall if defendant got back in Jones's car after that happened. On cross-examination, Garrett agreed that he never saw defendant with a gun on the date of the incident.

¶ 15　Villalobos testified that he interviewed Garrett on May 3, 2023. Garrett told him that the robbery was planned out. Garrett also told him where everyone was sitting in Jones's vehicle before the incident and he confirmed that they returned to the same seats after the incident. Garrett also told Villalobos that defendant and Gerard had guns. Two video clips of Villalobos's interview containing Garrett's statements about the robbery being planned beforehand (People's exhibit No. 160) and who possessed firearms (People's exhibit No. 163) were played for the jury and admitted into evidence.

¶ 16　Gerard testified that defendant was his cousin. In December 2023, Gerard pleaded guilty to armed robbery stemming from the events of December 11, 2017, and was sentenced to 27 years in prison to be served at 50 percent. As part of his plea, he agreed to testify against defendant. Gerard testified that, on December 11, 2017, he was at a friend's house when defendant asked him

to come outside. When Gerard went outside, Jones and Garrett were present in Jones's car. Gerard "knew of [Garrett]" and "had just met [Jones]." Garrett asked defendant "if he was trying to smoke." Gerard explained that this meant that Jones was asking defendant if he wanted to smoke weed. Gerard asked Jones to give him a ride home. Gerard and defendant entered the vehicle. Gerard sat behind the driver—Jones—and defendant sat behind Garrett.

¶ 17 According to Gerard, as Jones began driving, Garrett said he "had a lick," which Gerard explained meant that Garrett was "going to rob somebody." Gerard understood that the robbery was going to happen at Walmart. When they arrived at Walmart, Jones backed his vehicle into a parking spot. Gerard wanted to smoke, but Jones told him that he could not smoke in the car, so Gerard exited the vehicle and walked across the parking lot "to be out the way." Gerard returned to Jones's vehicle and then he went back to where he had been standing to wait for Perrin's vehicle to arrive. Gerard said he did not have a role in the robbery, he "was just spectating." Gerard admitted that he was armed with a gun.

¶ 18 When Perrin's vehicle arrived, Gerard saw defendant and Garrett exit Jones's vehicle and enter Perrin's vehicle. Gerard walked past Perrin's vehicle as he was making his way back to Jones's vehicle. He "was just really being nosy, trying to see who it was, really trying to see them do it really. Just entertainment or whatever." As Gerard walked past, he heard defendant say "Bro, he got a gun." Gerard "armed" himself and "came through the window, and *** stuck [his] gun in." Perrin was turned toward the backseat. Gerard saw Perrin's gun and "grabbed it." As they were "wrestling over the gun," Perrin's "car started rolling, and [they] crashed into another car."

¶ 19 Gerard testified that, as the vehicle rolled forward, he "ripped the gun from [Perrin] and started running back to the car." Gerard did not see any other guns in the car when he was standing by the driver's door. The incident happened in "[s]econds." Gerard was the first person to reach

Jones's car. As he was getting into the car, he "heard a pop and seen somebody laying on the ground." He recognized the pop to be a "[g]unshot." As he was running back to the car, he was not paying attention to where Garrett and defendant were. When the gunshot went off, Garrett was in the front passenger seat. Gerard did not see where defendant was, but he believed that he was outside of the car. He did not see a scuffle between defendant and Dubose. When Gerard entered the vehicle, he entered through the back passenger door and crawled across the seat to return to his original location behind Jones. Defendant entered after Gerard and sat behind Garrett.

¶ 20    Gerard testified that, after the incident, they were in "[s]hock." Defendant and Garrett were "frantic." Defendant wanted to call his mom. Gerard told everyone not to say anything and to just go home. Gerard told "everybody" to "give [him] their guns." Gerard testified: "So I had the driver's gun from the other car in there, [Garrett] gave me his gun, and [defendant] gave me his. So I just told them I was going to get them new guns or whatever, you know." Jones did not have a gun. According to Gerard, Garrett's gun was a black handgun, and he believed "it was a 9mm." Defendant's gun was a "black, 9mm." Gerard's gun "was a black Taurus, .40-caliber." Gerard took the guns because he wanted to get rid of them. Gerard learned that night that Dubose had died.

¶ 21    Gerard was arrested on December 14, 2017. Prior to that, he saw defendant who told Gerard that "he was just finna leave." When asked whether he was thinking of leaving as well, Gerard stated, no, because he did not think that he was going to get in trouble. When asked why he thought that, Gerard testified: "One, I ain't killed anybody, and I just really had nothing to do with it. I think all my actions was an instinct that night more than a plan so—" Gerard was asked what he did with the guns that he had collected from everyone. He testified:

"A. Once I figured out, you know, somebody died, I went and buried [defendant's] gun. And, you know, I put the other guns up. At a later date, then I ended up getting rid of those too.

Q. I'll go backwards from what you just described. So the guns that weren't the defendant's, you held on for a minute?

A. Yeah.

Q. How did you get rid of them?

A. I just—I threw them in the lake.

Q. Threw them in Lake Michigan?

A. Yes.

Q. Did you just say that you buried the defendant's gun?

A. Yes.

Q. Where did you do that?

A. Like, a little wooded area close to my house, like, by my backyard.

Q. Why did you bury that gun?

A. Just didn't want nobody to find it."

¶ 22    During his testimony, Gerard was shown surveillance video of the incident. People's exhibit No. 85 depicted Jones's vehicle entering the parking lot and backing into a parking space. It also showed Gerard exiting on the driver's side of Jones's vehicle and walking towards Walmart. People's exhibit No. 87 showed Gerard walking across the parking lot toward Walmart. People's exhibit No. 2 showed Gerard walking near Walmart as Perrin's vehicle entered the parking lot. The video showed Perrin's vehicle stop near Jones's vehicle, defendant and Garrett enter the backseat, and Perrin's vehicle pull into a parking space. The video also showed Gerard walking toward

- 9 -

Perrin's vehicle as it parked. The video next showed Perrin's vehicle travel forward and hit a parked vehicle. It then showed four men running from Perrin's vehicle toward Jones's vehicle.

¶ 23   In the video (People's exhibit No. 2), after Perrin's vehicle crashed into the parked vehicle, four individuals can be seen running from Perrin's vehicle towards Jones's vehicle. Two individuals (Gerard and Garrett) ran from the driver's side of Perrin's vehicle toward Jones's vehicle. Another individual (defendant) exits the back passenger seat and proceeds to run towards Jones's vehicle as another individual (Dubose) exits the front passenger seat and chases behind defendant. All four individuals run toward the passenger side of Jones's vehicle and in between Jones's vehicle and another parked vehicle. (Because the video is grainy, it is difficult to see exactly what transpired here.) Both vehicles exit the parking lot.

¶ 24   Waukegan police officer Jaroslaw Grzeda investigated the incident. Over the course of several days after the incident, Grzeda spoke with Perrin, Jones, Garrett, and Gerard. During a December 15, 2017, conversation with Gerard, Grzeda learned that the gun that was used to kill Dubose was buried under a tree at a residence in North Chicago. Grzeda went to the location and retrieved the gun—"a black semi automatic firearm"—which he found buried under a tree and wrapped in a "blue-colored mitt." During this same timeframe, Grzeda had been attempting to locate defendant. On January 4, 2018, Grezda learned that defendant was being held in Los Angeles, California.

¶ 25   United States Marshall Michael Sonethavilay testified that he was asked to assist in locating defendant. On January 4, 2018, defendant was found at an apartment in Inglewood, California, and arrested.

¶ 26   Lake Villa police officer Keith Lamanna testified that he recovered a shell casing from the scene. The shell casing was found on the ground right behind Dubose's head. Gary Lind, an expert

in firearm examination, testified that he compared the casing recovered by Lamanna to the gun recovered by Grezda—a "Walther, model PPS, 9mm caliber, semiautomatic pistol." The gun contained a magazine with seven 9-millimeter cartridges. Lind determined that the recovered casing had been fired from the recovered gun.

¶ 27 Dr. Kristin Escobar Alvarenga, medical examiner, testified that she performed the autopsy on Dubose. She concluded that Dubose died from a gunshot wound to the head. Alvarenga testified that a bullet entered the scalp on the top of Dubose's head on the right side. Alvarenga testified that, based on her examination, "the muzzle of the gun was within two feet from the wound—or from the decedent" when the gun was fired. She stated further: "[I]t's close range firing."

¶ 28 The jury found defendant guilty of count II (knowing murder) and count III (felony murder) and not guilty of count I (intentional murder). In addition, the jury found that the State failed to prove two allegations: (1) that defendant was armed with a firearm and (2) that defendant personally discharged a firearm. Had the former allegation been proven, defendant would have been subject to a sentencing range of 35 to 75 years in prison. See 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2016) ("if the person committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court"). Had the latter allegation been proven, defendant would have been subject to a sentencing range of 45 years to natural life in prison. See *id.* § 5-8-1(a)(1)(d)(iii) ("if, during the commission of the offense, the person personally discharged a firearm that proximately caused *** death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court"). Absent the firearm enhancements, defendant was instead subject to a sentencing range of not less than 20 years and not more than 60 years. See 730 IL 5/5-4.5-20(a)(1) (West 2016).

¶ 29    A sentencing hearing took place on October 25, 2024. The State presented two of Dubose's family members—his sister and mother—who each read a victim impact statement. The State asked that defendant be sentenced to "something greater than 40 years" in prison, which would be the "halfway point" of the sentencing range. Defense counsel asked for a sentence "closer to the bottom end of the 20 to 60 [range]." Counsel stated:

> "Judge, I want to talk about some of the things that the jury found. We had these special interrogatories; that despite every single witness stating that the defendant had a gun and was the person who used it to shoot the victim here, the jury found that the State did not prove that the defendant had a gun. Despite every single witness stating that the defendant was the person who shot *** Dubose, the jury ruled that he did not fire—or did not find beyond a reasonable doubt that he fired the gun that killed *** Dubose.

> So how are we supposed to look at that? What I think is going on here, and there is—and I think we have a very good view into what the jury was thinking here. They felt he was kind of getting a bad—wasn't being treated fairly in how the co-defendants were sentenced and how he was sentenced.

> Now obviously you're the one who has total authority as to sentencing, but I think it's very illustrative."

¶ 30    In imposing defendant's sentence, the trial court stated as follows:

> "The [c]ourt has considered the presentence investigative report. I've reviewed it. I considered the victim impact statements presented here today. I also considered the evidence at trial, and the arguments of the attorneys as to possible sentencing parameters. I've also considered the factors that the statutes provide for mitigation and aggravation.

- 12 -

In terms of mitigation, I agree that this defendant at this time in his life has not had an extensive criminal history. And I find that to be in his favor. I do not find that this defendant acted under a strong provocation as suggested.

To the contrary, as has been suggested, the evidence supported the conclusion[ ] that this all began as a robbery. And [defendant] understood it was to be a robbery and [he] was one of the team. It was premeditated. Because robberies usually are not or typically are not often acquiesced to, you anticipated some resistance. That's why you brought a firearm, to overcome any resistance that may appear. But you brought a firearm capable of obviously deadly force. And that was premeditated. You contemplated the possible need to use deadly force to complete a robbery of cannabis, worthless cannabis. It is a shame.

I hope it meant something to you, as it did to me, to hear the destruction of their family. That's what comes from living a life where you engage in buying and selling drugs, I suppose. But when you introduce deadly weapons into the formula, the ripples of trauma that you send, they go on and on and on and on.

[Defendant], you're not the first person frankly with the almost exact set of circumstances that I've seen. It's just shocking though. Even after all of those cases, I'm still shocked because it seems to demonstrate somehow a lack of concern for life. And I don't have an answer to that. But I do find that you have a limited criminal history, and yet you've done what I consider to be the ultimate crime. You've taken someone's life because you wanted to escape. He was unarmed. You were armed. And he's dead. And you wanted to get away to avoid prosecution, I imagine, or whatever. You wanted to keep his cannabis. So meaningless. Not only did you affect their family in such a deep way, but you probably affected the people that love you as well. No one wishes that you were here today. They

wish [Dubose] was still spending his time with his family. But we don't have that. And that's because of a decision you made with these others. No one, as your attorney I'm sure indicated, nobody ever wakes up and says today's the day I'm going to kill somebody else. Today's the day I'm going to throw my life away. Who would do that? I understand that these things happen under emotion without much thought, but I can't ignore the thought you put into it in preparing for the robbery.

All right. The range of punishment for this particular offense is 20 to 60 years. Considering all of the factors that may apply in mitigation or aggravation, I'm going to sentence this defendant to 40 years in the Illinois Department of Corrections to be followed by three years of mandatory supervised release. That's a lot of time. I know it. But it's appropriate under the circumstances that I've gone over with you."

(The court merged count II into count III and sentenced defendant on count III.)

¶ 31 On October 29, 2024, defendant filed a motion to reduce his sentence or, alternatively, for a new sentencing hearing. Defendant argued that the trial court failed to give appropriate weight to the mitigating factors. According to defendant, there were substantial grounds tending to excuse or justify his conduct, even if it failed to establish a defense, and defendant had a lack of a serious criminal background.

¶ 32 On November 15, 2024, the trial court denied defendant's motion. The court stated:

"[I did] give due consideration of all of the statutory factors, both mitigation and aggravation, and I think I even spoke to the events at trial in a way that there was some evidence that [d]efendant was trying to flee a situation although created by his own doing, that it did not establish a defense. But I did consider the manner in which the crime

- 14 -

occurred, and I did consider—and I think I commented on his lack of serious criminal background."

¶ 33    Defendant timely appealed.

¶ 34                                    II. ANALYSIS

¶ 35    Defendant contends that the trial court abused its discretion in sentencing him to 40 years in prison. According to defendant, the court erred in considering in aggravation that defendant was armed with a firearm, because the supporting evidence was unreliable. We note that defendant does not contend that his possession of a firearm—were it supported by reliable and relevant evidence— could not properly be considered as an aggravating factor; he argues only that there was no such reliable evidence.

¶ 36    Defendant concedes he has forfeited his claim of sentencing error by failing to raise it in the trial court. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Nevertheless, defendant requests (1) plain-error review or (2) a finding that counsel provided ineffective assistance for failing to properly raise the issue below.

¶ 37    The plain-error doctrine "is a narrow and limited exception" to forfeiture. *Id.* at 545. To obtain relief under the doctrine, "a defendant must first show that a clear or obvious error occurred." *Id.*; see *People v. Jackson*, 2022 IL 127256, ¶ 21 ("When a defendant invokes the plain error rule, the first step in the analysis is to determine whether a clear or obvious error occurred."). "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 544. Here, defendant requests review under the

first prong. The defendant has the burden of persuasion under both prongs of the plain-error doctrine. *Id.* If the defendant fails to meet this burden, we will honor the procedural default. *Id.*

¶ 38    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Generally, to establish prejudice in sentencing, the defendant must show a reasonable probability that the trial court would have imposed a lesser sentence if his counsel had not erred. See *People v. Steidl*, 177 Ill. 2d 239, 257 (1997) ("Ineffective-assistance-of-counsel claims concerning a sentencing hearing must show that counsel's performance fell below minimal professional standards and that a reasonable probability exists that the sentence was affected by the poor performance").

¶ 39    We first consider whether defendant's sentencing claim warrants review under the plain error doctrine. As noted, the first step in a plain error analysis requires us to determine whether the trial court committed a clear or obvious error in sentencing defendant. See *Jackson*, 2022 IL 127256, ¶ 21.

¶ 40    The following well-established legal principles apply to a trial court's sentencing decision:

"We will not disturb a sentence falling within the statutory range for an offense unless the trial court has abused its discretion. [Citation.] Where the sentence falls within the statutory range, an abuse of discretion occurs where the court has imposed a sentence that greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense [citation], or where the sentence does not reflect adequate consideration of relevant factors in mitigation or the defendant's rehabilitative potential [citation]. Nevertheless, so long as it does not ignore relevant factors in mitigation or

consider improper factors in aggravation, the court possesses wide latitude in imposing a sentence. [Citation.] We also presume that the court has considered all relevant evidence in mitigation, absent some affirmative indication to the contrary beyond the sentence itself. [Citation.] The existence of mitigating factors neither requires the imposition of the minimum sentence nor precludes the imposition of the maximum sentence; rather, the court must balance all relevant factors and reach a reasoned decision about the appropriate punishment in each case. [Citation.]" *People v. Campos*, 2024 IL App (2d) 230056, ¶ 54. " 'The most important sentencing factor is the seriousness of the offense.' " *People v. Holman*, 2025 IL App (2d) 240513, ¶ 55 (quoting *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010)). "This includes the nature and circumstances of the offense." *Id.* In imposing a sentence, trial courts must "make determinations based only upon the evidence presented." *Steidl*, 177 Ill. 2d at 266.

¶ 41 Here, defendant contends that the trial court erred in considering that defendant was armed during the offense because the evidence of defendant's firearm possession was "wholly unreliable." He notes that all the evidence came from "cooperating co-defendants," who were "convicted felons" and "admitted liars." He claims that while "[t]heir testimonies at trial align in some general respects," it "diverged on significant details, namely whether [defendant] had a gun." Defendant also notes that the jury found that the State failed to prove that defendant (1) was armed with a gun and (2) personally discharged a gun. Thus, according to defendant, the jury implicitly found that the evidence that he possessed a gun was unreliable. We disagree.

¶ 42 We find no abuse of discretion in the trial court's finding that defendant was armed as there was reliable testimony to support that finding. We note that the burden of proof at sentencing is less than the beyond-a-reasonable-doubt standard applied at trial. *People v. Holman*, 2025 IL App (2d) 240513, ¶ 56; see *People v. Jackson*, 149 Ill. 2d 540, 549 (1992) ("We need not decide now if

any specific traditional standard of proof applies at sentencing. Important to our analysis here is that the burden of proof at sentencing is lower than proof beyond a reasonable doubt and that evidence received be relevant and reliable"). Therefore, "evidence of criminal conduct can be considered at sentencing even if the defendant has been previously acquitted of that conduct, as an acquittal is not necessarily conclusive evidence that the defendant did not commit the alleged acts but merely that the government was unable to prove beyond a reasonable doubt that defendant committed them." *Holman*, 2025 IL App (2d) 240513, ¶ 56; see *People v. Deleon*, 227 Ill. 2d 322, 340 (2008) ("It is well established that 'evidence of criminal conduct can be considered at sentencing even if the defendant previously had been acquitted of that conduct' " (quoting *Jackson*, 149 Ill. 2d at 549-50)).

¶ 43 Here, the trial court acted well within its discretion in considering the evidence of defendant's gun possession when it sentenced him. While the supporting evidence was based primarily on testimony from three cooperating witnesses, who initially lied to the police concerning their involvement, their trial testimonies were not so unreliable to warrant a finding of error. As defendant notes, the testimonies were aligned in several respects. In any event, the court was aware of the codefendants' plea agreements and their agreement to testify.

¶ 44 Testimony from Jones, Garrett, and Gerard placed defendant outside of Jones's vehicle when Dubose was fatally shot. There is no dispute that Jones and Garrett were inside Jones's vehicle. Gerard was either in the process of entering the passenger side backseat (his testimony) or had run around to the driver's side (Jones's testimony). Jones testified that he heard a pop after he saw defendant and Dubose go down to the ground. Garrett agreed that he told Villalobos that he heard a pop after he entered Jones's vehicle and while defendant was still outside. Gerard testified that he heard a pop as he was entering Jones's vehicle. The autopsy revealed that Dubose

was shot from within a distance of two feet. Based on the evidence, the court could have reasonably inferred that defendant was the only one who would have been able to fire the fatal shot.

¶ 45     Further, although Garrett testified at trial that he could not remember whether "any other firearms [were] pulled out" when Gerard pointed his gun into Perrin's vehicle, and that he never saw defendant with a gun, Villalobos testified that Garrett told him that defendant and Gerard each had a gun. The video of Garrett's statement was played in court. In addition, Gerard testified that, as they left the scene, he told everyone to give him their guns so that he could get rid of them. According to Gerard, both defendant and Garrett gave him their guns. After Gerard learned of Dubose's death, he buried defendant's gun (a "black, 9mm"), and he disposed of his gun ("a black Taurus, .40-caliber"), Garrett's gun (a black "9mm"), and Perrin's gun in Lake Michigan. It was determined that the gun buried by Gerard—a "9mm caliber, semiautomatic pistol"—was used to fire the bullet that killed Dubose.

¶ 46     Based on the foregoing evidence, the trial court could have reasonably concluded that the evidence was reliable and that it established that defendant was armed with a gun at the time of the offense. Indeed, the evidence allowed for a reasonable inference that defendant not only possessed a firearm at the time of the offense but also personally discharged it. To be sure, the jury found that the State did not prove that defendant possessed and discharged a gun. However, as noted, the same standard of proof applied at trial does not apply here. In any event, the jury could have come to that conclusion on the firearm enhancement for any number of reasons, "such as compromise or lenity." See *People v. Ware*, 2019 IL App (1st) 160989, ¶ 56. Defense counsel noted as much at sentencing.

¶ 47     Because the trial court did not abuse its discretion in fashioning defendant's sentence, defendant is unable to show an error. See *Hillier*, 237 Ill. 2d at 545 (to obtain relief under the plain-

error doctrine, a defendant must first show that the trial court erred). Absent a clear or obvious error, there can be no plain error; thus, defendant's forfeiture stands. See *Campos*, 2024 IL App (2d) 230056, ¶ 63.

¶ 48 For the same reasons, we find no merit to defendant's alternative contention of ineffective assistance of counsel. As noted, to prevail on an ineffectiveness claim, defendant must establish both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. See *Strickland*, 466 U.S. at 687-88. Here, we have determined that the trial court did not abuse its discretion in sentencing defendant. As there was no error, defendant's ineffectiveness claim premised on counsel's failure to preserve the error also fails. See *People v. Redmond*, 2025 IL App (1st) 23175, ¶ 63 ("Counsel's performance cannot be considered deficient when no error occurred. Nor could defendant have suffered any prejudice by counsel's actions"); *Campos*, 2024 IL App (2d) 230056, ¶ 64 (concluding that "counsel's failure to preserve the claimed sentencing errors cannot have caused prejudice, as there was no abuse of discretion in the court's sentencing decision").

¶ 49                                    III. CONCLUSION

¶ 50 For the reasons stated, we find defendant's sentencing contentions lack merit. We therefore affirm the judgment of the circuit court of Lake County.

¶ 51 Affirmed.