2026 IL App (2d) 250078-U
No. 2-25-0078
Order filed April 6, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. DARRYL E. HOLMAN, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Bianca Camargo, Judge, Presiding.
No. 21-CF-1897

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying defendant's motion to suppress where he did not unequivocally invoke his right to remain silent when he refused to answer questions related to a particular incident, but otherwise willingly spoke with police regarding other incidents; the trial court erred when it admitted unduly prejudicial other crimes evidence; and defendant received ineffective assistance of counsel when trial counsel introduced a jury instruction saying that the other crimes evidence could be considered for propensity and failed to introduce a limiting instruction regarding prior convictions which were admitted for the limited purpose of impeachment. Reversed and remanded for new trial.

¶ 2    Defendant Darryl E. Holman appeals his convictions of aggravated criminal sexual assault and criminal sexual assault for which he was sentenced to 24 years' imprisonment. For the following reasons we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4     In the instant case, defendant was charged with one count of criminal sexual assault and two counts of aggravated criminal sexual assault (bodily harm and dangerous weapon). The basic allegations of the case are as follows. On July 19, 2021, defendant and the complaining witness, J.W., who were both members of the Aurora homeless community, went out to drink together. At some point they encountered a man named Gerald "Wayne" Darrough, and defendant struck Wayne in the head, knocked him unconscious, and stole his keys. This incident was the subject of Kane County case No. 21CF1769 (Wayne's case). That case went to trial before the instant case and defendant was found guilty of felony theft from a person and not guilty of aggravated battery and robbery; we affirmed. See *People v. Holman*, 2025 IL App (2d) 240513. After taking Wayne's keys, defendant and J.W. went to Wayne's apartment and stayed there for approximately three nights. On either the second or third night, defendant pulled a knife on J.W. and forced her to have anal sex. J.W. escaped when defendant went to go buy drugs and she eventually reported the incident to police.

¶ 5                                   A. Pre-Trial Motions

¶ 6     In an unrelated case, defendant was arrested on August 4, 2021, and charged with four counts of aggravated battery (battery case). A public defender was appointed to represent defendant.

¶ 7     On September 10, 2021, Detective Grabowski of the Aurora Police Department, who was the investigator assigned to all three of the above-described cases, interrogated defendant while he was in custody at the Kane County Jail. Grabowski obtained a *Miranda* waiver from defendant and initially questioned him regarding the battery case. This interview was video recorded. The

*Miranda* waiver and discussion of the battery case run from timestamp 00:00-18:40 on the recording.

¶ 8      Grabowski then began to question defendant regarding Wayne's case. Defendant answered some preliminary questions, indicating that he knew Wayne and was friends with him, but then refused to speak further on the topic when Grabowski started asking about the alleged battery, stating, "I don't think I'll be talking to you about this." Grabowski made a few more attempts to get defendant to speak regarding Wayne before moving on to other matters. Grabowski questioned defendant regarding Wayne's case from approximately 18:40-21:20, with defendant stating "I don't think I'll be talking to you about this[,]" at approximately 19:28. Grabowski then questioned defendant regarding the instant case from 21:20 to the end of the recording at 57:40, when defendant asked to speak with Grabowski off the record and the recording was stopped. The recording was resumed on a separate file and continued for another 28 minutes and 42 seconds.

¶ 9      On August 30, 2022, defendant filed an amended motion to suppress the statements made during his interview with Grabowski. The State conceded that the portions of the interview related to the battery case were inadmissible (00:00-18:40), as defendant had been appointed counsel in the battery case at the time the interview occurred. The State maintained that with regard to Wayne's case, defendant had answered some questions before invoking his right to remain silent (*e.g.*, defendant knew Wayne and was friends with him), and therefore those portions were admissible (18:40-19:28). The State conceded that the questions and answers related to Wayne's case which were made after defendant invoked his right to remain silent were inadmissible (19:28-21:20). The State maintained that the portions of the interview relating to the instant case were admissible (21:20-57:40 and the second recording).

¶ 10    A hearing on the motion to suppress was held on September 7, 2022. Grabowski testified at the hearing providing some clarifying details. Most notably, he clarified that at the time of the interview, defendant had not yet been charged in either Wayne's case or the instant case. Defendant argued that because he was represented by counsel in the battery case at the time of the interview, the waiver of his *Miranda* rights was defective not only as to the battery case, but as applied to the entirety of the interview. The State maintained that the right to counsel was case specific, and that defendant could be questioned regarding uncharged offenses.

¶ 11    The trial court took the matter under advisement and issued an oral ruling on October 27, 2022. The trial court found that defendant's right to counsel had been violated during the portions of the interview where the battery case was discussed, as defendant was in custody on the issue for which he was being questioned and had been appointed counsel (finding 00:00-18:40 to be inadmissible). Regarding Wayne's case, the trial court found that defendant had invoked his right to remain silent when he told Grabowski that he did not want to speak about the incident, and that anything said afterward was inadmissible in the State's case-in-chief. However, defendant's responses could be used as prior inconsistent statements, as the State had not violated defendant's right to counsel (finding 18:40-19:28 to be admissible and 19:28-21:20 to be inadmissible). Regarding the instant case, the trial court found that defendant's right to counsel was not violated as the incident at issue was unrelated to that in the battery case, and therefore those portions of the interview were admissible (finding 21:20-57:40 and the second recording to be admissible).

¶ 12    On June 5, 2024. The State filed a motion to admit other crimes evidence pursuant to Illinois Rule of Evidence 609(a) (eff. Jan 1., 2011). In that motion the State sought to admit a 2008 armed violence conviction, a 2018 aggravated DUI conviction, and defendant's 2023 conviction for felony theft in Wayne's case for the purpose of impeachment. Defendant argued that none of

these prior convictions should be admitted because the probative value of the convictions was substantially outweighed by the danger of unfair prejudice. The trial court ultimately granted the State's motion to admit the armed violence and theft convictions and denied the motion as to the aggravated DUI conviction.

¶ 13 The State filed a motion to admit evidence that, on July 19, 2021, J.W. saw defendant strike an unknown man (Wayne) with enough force to knock him unconscious. Defendant then took the man's keys and grabbed J.W., forcing her to flee with him and striking her on the head for being too slow. The State's motion argued that it anticipated defendant would seek to impeach J.W.'s allegations of sexual assault by arguing that she continued to stay at the apartment with defendant following the alleged sexual assault, that she engaged in sexual conduct with defendant the following morning, and that she remained with defendant for several days after the assault. The State argued that it anticipated J.W. would testify that she did those things because she feared defendant based on the acts of violence she had seen him commit, and therefore J.W.'s testimony would be relevant to show the basis for that fear. Defendant argued that the events the State sought to admit were irrelevant and unduly prejudicial, particularly as defendant had been found not guilty of battery and robbery in Wayne's case. On August 15, 2024, the trial court granted the State's motion to admit, stating, "I think it goes to a continuing course of conduct. It also could explain why the complaining witness did the things that she did."

¶ 14                                            B. Jury Trial

¶ 15 The matter proceeded to jury trial on August 26, 2024. The State called J.W. as its first witness who testified as follows: She had previously been homeless in Aurora but now lived at a "harm reduction program." She first met defendant a few months prior to July 2021. She had recently returned to Aurora from De Kalb and was staying at a campsite she had stayed at

previously. She met defendant through a mutual acquaintance at the campsite, and he allowed her to share a tent with him. At the time, her relationship with defendant was non-sexual. Defendant asked her for sex on one occasion and kept "bugging" her. So, she gave defendant a hand job to stop defendant from bugging her, which worked "for a while."

¶ 16    In July 2021, J.W. moved in with her friend Anne Scott who had an apartment in Aurora. In the late morning or early afternoon of July 19, 2021, defendant came to Scott's house to see J.W. They talked for a bit and went out to get beer.

¶ 17    Later that evening J.W. was drinking with defendant under a viaduct on Clark Street and Broadway. Three men came walking up the street. Defendant ran over to them and punched one of the men knocking him to the ground unconscious. The other two men ran away. Defendant then went through the man's pockets and took his keys. Defendant then told her, "hurry up [] let's go, let's go, let's go." J.W. was gathering their possessions to leave, and defendant grabbed her. J.W. identified two photographs of the viaduct, which were admitted into evidence.

¶ 18    She and defendant then went to the liquor store and then went to an apartment at 316 South LaSalle Street. They entered using the keys defendant had taken. J.W. identified 13 photographs as depicting the exterior and interior of the building, which were admitted into evidence. The apartment was set up as a boarding house with a common bathroom on the second floor. Defendant and J.W. entered unit D using the keys. The unit consisted of one room with a bed, chair, TV, sink, and closet. Defendant and J.W. spent the night in unit D, sharing the bed. Defendant did not attempt anything sexual that night.

¶ 19    The next day, July 20, 2021, J.W. and defendant went out and continued drinking. They may have gone to a church to receive donated clothes. Eventually, they went back to unit D. J.W. "[didn't] really remember" what happened when they got back to the apartment, "[p]robably just

- 6 -

drinking and talking and maybe listening to music or something." J.W. testified that defendant "probably" smoked something. She was "not sure," but she "[thought] he was smoking crack." J.W. admitted to having trouble remembering that night. They again spent the night in the apartment, and the next day went out and spent the day in Aurora.

¶ 20 The State asked J.W. if she recalled "a night where the defendant smoked something and something happened." J.W. answered that there was a night she saw defendant smoke crack from a glass tube. Then, "[h]is eyes like turned into the back of his head and he turned all beat red like the devil and then he started speaking to me in Hebrew and telling me what my Hebrew name was." Defendant then pulled out a knife and sat across from J.W. He told her to "take [her] fucking clothes off or he was going to cut them off."

¶ 21 J.W. described feeling in shock. Defendant then hit her and told her to hurry up. She started to take her clothes off, beginning with her pants, but could not get her bra off fast enough, so defendant hit her again. Eventually she took all of her clothes off and was completely naked. She believed that defendant still had the knife, but he was behind her and she could not see. Defendant then grabbed J.W. by her hair and pushed her down to the floor, telling her to lift up her hips and "open [her] ass." She felt "humiliated." Defendant then "slapped on some Vaseline [to his penis] and just slammed it in [to her anus]." This hurt and she lifted her head up. Defendant said, "head to the floor, head to the floor," and "bounced" J.W.'s head on the floor again. She then stayed in that position "until it was over."

¶ 22 J.W. asked to go to the bathroom, and defendant told her to "use the sink." She then asked, "what if I have to pooh [sic]" and he said, "use the garbage can." She did not ultimately use the sink or garbage can, saying she had "stage fright." She did not try to leave the apartment or call

the police because she was scared of defendant. J.W. identified a photograph of her forehead with a large bruise on it from where she hit her head on the floor, which was admitted into evidence.

¶ 23    That night J.W. slept in the bed with defendant once more. She did not try to leave because she "knew he would hear the door unlock." The next morning, she looked at defendant and told him, "I don't even know why I am speaking to you because you raped me last night." Defendant did not respond and just stared at her. They were going to go out and get beer that day, but J.W. "just wanted to keep [defendant] happy so [she] wouldn't get hurt anymore." The two then "wound up having [vaginal] sex." J.W. did not remember if defendant initiated it, but she "just la[id] there" and "kind of let it happen" because she "didn't want to get hurt anymore."

¶ 24    The two then went out and spent the day in Aurora. J.W. did not go to the police, because defendant was next to her the whole day. At some point J.W. encountered Officer Sullivan of the Aurora police outside of the liquor store near the viaduct. She knew Officer Sullivan, who came over to speak with her. Officer Sullivan asked about her head injury, but she did not say anything because defendant was right there. When she did not say anything, the officer said, "huh, never mind."

¶ 25    While outside the liquor store, at some point, defendant left to go get drugs. J.W. then "took off" and called Anne to come and pick her up. She then spent the next few days at Anne's apartment. On July 25, 2021, J.W. went to receive a sexual assault examination at Mercy Hospital. Between the time of the sexual assault and the examination, she had gone to the bathroom, showered, and wiped. J.W. identified several photographs of herself that were taken during the sexual assault examination. The pictures showed scabbing on her right knee and bruising on her back, which she believed occurred when she and defendant fled from the viaduct after defendant took the keys. There was also bruising on the underside of her upper left arm, which J.W. identified

as being from defendant grabbing her arm. She did not specify when. There were also scabs on her right elbow, which she was unsure how she got.

¶ 26    J.W. had taken a piece of mail from the apartment D address to Gerald Darrough (Wayne), which she gave to Detective Grabowski.

¶ 27    On cross-examination, J.W. testified that around the time of the assault she was drinking four or five tall Max Ices a day. J.W. clarified that her testimony was that the sexual assault occurred on July 21, 2021, and that she left defendant the next day, whereas her original statement to Grabowski was that the assault occurred on July 20, 2021. Likewise, she had not mentioned to Grabowski about defendant speaking Hebrew, or defendant telling her to defecate in the garbage can. J.W. stated that she had not heard anyone else in the apartment building during the sexual assault and had not seen anyone on the occasions she went to use the bathroom.

¶ 28    The State next called Detective Grabowski of the Aurora Police Department. Grabowski was the lead investigator assigned to the instant case. On July 28, 2021, Grabowski had a conversation with J.W. During that conversation J.W. gave Grabowski the piece of mail she had taken from the apartment. She also asked Grabowski to retrieve her bag, which she had left at the apartment at 316 S. LaSalle Street. Grabowski went to the apartment, spoke to the owner, and was allowed into unit D. Grabowski photographed the apartment and retrieved J.W.'s bag, which contained her clothes and personal effects. A photograph of the bag was admitted into evidence. Grabowski also examined defendant's backpack, which was in possession of the Aurora Police Department's booking department. Inside the backpack Grabowski found a tub of petroleum jelly, which he photographed. That photo was admitted into evidence.

¶ 29    A redacted version of Grabowski's September 10, 2021, interview with defendant was played for the jury. In the interview, Grabowski asked defendant, "who's this girl you got?"

Defendant explained that he did not have a girl "now," but that before he was arrested, he had a girl. Grabowski asked if the girl was J.W., and defendant said, "[y]eah." Grabowski then asked defendant to tell him about J.W.:

> "Grabowski: Okay. So, tell me a little bit about [J.W.].
>
> Defendant: (Leaning back in chair.) —Wow.
>
> Grabowski: This is your opportunity to tell me—
>
> Defendant: Wow really— (Shaking head.)
>
> Grabowski: What's wrong?
>
> Defendant: That's just— That's just not— Yeah. To tell you what?"

Defendant went on to say that he and J.W. had been in an on-again-off-again relationship. They had shared a tent together in the past. J.W. then began living with a friend. Defendant would pick her up and they would go out for days at a time. During this time, they would stay in some spots out in the woods. Grabowski asked if they had stayed at Wayne's and defendant said they had stayed there also. During the time they stayed at Wayne's, defendant considered he and J.W. to be "on again." Grabowski asked defendant if during that time he and J.W. had sex and he said yes. Grabowski asked where and defendant responded, "Where didn't we." Grabowski asked if they had sex at Wayne's and defendant said, "yeah." When asked how J.W. reacted when they had sex at Wayne's, defendant responded that "nothing seemed any different than any other time." Defendant stated that they had been using drugs during that time, namely cocaine and alcohol. Grabowski asked if defendant had gotten into a fight with J.W., which he denied. Grabowski then showed defendant photographs of J.W.'s injuries and asked how she got them. According to defendant, J.W. already had the bruises on her forehead when he came to pick her up, and she told him she had got into a fight. The cut to her forehead was caused by hitting her head on a banister

at Wayne's. Defendant stated that he caused the bruising to J.W.'s upper left arm by "grabbing her on the sidewalks, telling her come on, let's go" near River Edge Park in downtown Aurora. Defendant denied having non-consensual sex with J.W. or getting violent with her during sex. Defendant stated that he always carried a knife but denied threatening J.W. with the knife.

¶ 30 The State next called Anne Scott. Scott lived in an apartment in Aurora during July 2021. J.W. had been her friend for around 14 years and Scott periodically allowed her to stay at her apartment. On July 19, 2021, J.W. was staying with Scott. Defendant came over to pick up J.W. and stayed for around an hour while J.W. got ready. The two then left the apartment. J.W. was gone for at least a day and a half. Eventually Julie called her and asked Scott to come meet her. Scott then went out to go meet J.W. and eventually met her on Broadway. When she saw J.W. she first thought that she was covered in dirt, "like she slept outside," but as she got closer, she realized they were bruises. She observed bruising to J.W.'s back, throat, head, arms, and legs. She asked J.W. what happened, and J.W. told her that she had been raped by defendant.

¶ 31 Sergeant William Sullivan of the Aurora Police Department testified that on July 22, 2021, he was working as a patrol officer as well as a homeless liaison officer. Around 3 or 4 p.m. Sullivan went to For More Liquors, an area where Aurora's homeless population is known to congregate. There was a group of four to six people drinking outside the liquor store, including J.W. and defendant. Sullivan went over to the group to "say hi and check in." He observed injuries to J.W.'s head and face and asked her what happened. J.W. got real quiet and did not share how she got her injuries. Sullivan had spoken with J.W. dozens of times and they had a good rapport. He described her behavior that day as "not at all" her normal behavior. On cross-examination, Sullivan clarified that he could not have pulled her aside for a private conversation without tarnishing her reputation in the streets.

¶ 32    The State presented further evidence regarding the sexual assault examination J.W. underwent. Sex Assault Nurse Examiner Alissa Bartlett performed her examination of J.W. on July 25, 2021. As part of the examination, J.W. made a statement to Bartlett explaining what had happened, which Bartlett transcribed as part of her report. That transcription was admitted into evidence and read as follows:

> "Patient states: On Tuesday night maybe around 11pm I was hanging out with him and we were drinking at the apartment. He was smoking crack and whenever he does that he just gets all crazy, like his eyes roll in his head. He tried to have sex with me but when I said no he pulled a knife. He held it to my neck and said take your clothes off or I'll cut them off of you. I took my clothes off because I thought he would kill me. He has assaulted me before but never pulled a knife on me. So I knew it was different. I was taking them off but he said I wasn't fast enough so he grabbed me by the back of my head and pushed me to the ground, that now I have this bruise on my head. He just kept slapping me. He told me to get down on the ground on my hands and knees and to spread my butt cheeks apart. That's when he did it. He used Vaseline and put it in there, in my butt. He finished inside me and the whole time he was hitting and slapping me. He choked me a couple times too. After he was done I got up and cleaned myself. He wouldn't let me go to the bathroom so I had to use a sink there and cleaned myself. I stayed the night with Darryl because I was afraid to leave. The next morning I had sex with him to keep him happy so he wouldn't hurt me. This time I was on top and we had sex. He finished inside my vagina and didn't use a condom either times."

During her examination, Bartlett took several photographs of J.W.'s injuries which were admitted into evidence. Officer Gabriella Gutierrez of the Aurora Police Department also photographed

- 12 -

J.W.'s injuries. These were the photographs which had been previously admitted during J.W.'s testimony.

¶ 33 Bartlett conducted an examination of J.W.'s vagina and anus. The results of those examinations were normal with no signs of trauma. Bartlett explained that "depending on when the assault occurred, there can be different stages of healing[,]" and that there are "[n]ot necessarily" always signs of trauma in cases of forcible sexual penetration. Bartlett also took swabs from J.W.'s vagina and anus for DNA testing. J.W. indicated to Bartlett that between the sexual assault and her examination she had urinated, defecated, washed/wiped her genitals, bathed, and showered. DNA testing revealed no male DNA on the vaginal and anal swabs.

¶ 34 Forensic scientist Bill Cheng was accepted by the court as an expert in the field of forensic DNA analysis and identification. Cheng explained that the passage of time, urinating, defecating, washing, wiping, bathing, or showering all would make it less likely that foreign DNA would remain on the surface of a sexual assault victim's vagina or anus.

¶ 35 The State then rested. Defendant moved for a directed verdict, which was denied.

¶ 36 The defense called Officer Jimaris Velasquez of the Aurora Police Department. On July 25, 2021, Velasquez spoke with J.W. at Mercy Hospital after being dispatched on a reported sexual assault. J.W. reported that the sexual assault occurred on July 20, 2021, and that as a result she was experiencing rectal bleeding.

¶ 37 Defendant testified next. Defendant stated that in July 2021, he was homeless and living in Aurora. In May 2021, J.W. came to defendant for protection from an ex-boyfriend and asked to move in with defendant and he allowed J.W. to live in his tent with him. During that time, he and J.W. developed a relationship. In July, defendant asked J.W. to leave, and J.W. moved in with Scott. On July 19, 2021, defendant went to Scott's house to pick up J.W. and bring "her breakfast," *i.e.*,

alcohol. Defendant explained that at that time he and J.W. both had substance abuse issues and would drink and use cocaine. They left Scott's apartment together to panhandle and drink. At some point that evening, defendant got into an altercation with a Mexican man who was part of the homeless community in Aurora. He had two friends with him who ran away. Defendant stated that the man he got into an altercation with was not Wayne. Defendant then wanted to leave in a hurry, as he was not sure if the man had a weapon or if his friend would come back, and he grabbed J.W. by the arm.

¶ 38 They left and later encountered Wayne passed out drunk with his keys lying on the ground next to him. Defendant took Wayne's keys. He explained that he did this because he had previously stayed with Wayne. Defendant and J.W. then went to Wayne's apartment. There they used drugs and continued drinking. At some point the two were arguing on the front steps of Wayne's apartment building. Defendant made a comment that she did not like and she struck him. Defendant then "turned back real quick" and she pulled away from him, hitting her head on the banister, which is how she got the cut on her forehead.

¶ 39 Defendant stated that he and J.W. were in a sexual relationship and had sex the night of July 20, 2021.

¶ 40 The next day, July 21, 2021, the two went to Not Forgotten Ministry to meet with the pastor who then went with them to the public aid office. That night defendant and J.W. again stayed at Wayne's and had sex. Defendant stated that he did not threaten J.W. in any way, did not pull a knife on her, or otherwise use force.

¶ 41 The next day, July 22, 2021, defendant and J.W. went out to panhandle and drink. At some point defendant left J.W. to purchase drugs. He then got a phone call from J.W. telling him to return to her. When he arrived there seven to ten homeless people were sitting on the grass. J.W. was

there, as was Officer Sullivan. Defendant was there the entire time Sullivan was, and he overheard a conversation between J.W. and Sullivan. Defendant also witnessed a man being arrested.

¶ 42    Defendant did not spend the night of July 22, 2021, at Wayne's place. Instead, he and J.W. stayed out all night drinking and talked about making plans to help get J.W.'s daughter back. The two talked about going to rehab for their substance abuse issues. The day of July 23, 2021, defendant left J.W. and checked himself into rehab. Defendant denied ever raping J.W.

¶ 43    On cross-examination, defendant testified that prior to finding Wayne passed out drunk, he had obtained permission to stay at Wayne's place, sleep in his bed, have sex in his apartment, do drugs, and use his utilities. He did not seek out help for Wayne, but rolled him over on his side, so he would not choke on his own vomit. Defendant admitted to carrying a knife during that time period. Defendant also claimed that in the interview with Grabowski, when referring to the injury J.W. already had when he came to pick her up, he was not referring to bruises on her forehead.

¶ 44    The defense then rested.

¶ 45    In rebuttal, the State admitted defendant's armed violence conviction from August 29, 2008, and defendant's felony theft conviction from June 23, 2023 (Wayne's case). No limiting instruction was given at that time, nor was any included in the final jury instructions.

¶ 46    During the preliminary jury instruction conference, which was held prior to the close of the State's case-in-chief, defense counsel offered a modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved October 17, 2014) (hereinafter IPI Criminal No. 3.14)

¶ 47    The instruction read:

>   "Evidence has been received that the defendant has been involved in conduct other than those [*sic*] charged in the indictment.

This evidence has been received on the issues of the defendant's intent, motive, design, and *propensity* and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of intent, motive, design, and propensity." (Emphasis added.)

The base instruction provides a list of several possible "issues" which can be filled in depending on the purpose for which the instruction is given, including a blank option. None of these include "propensity."

¶ 48 The trial court asked defense counsel if they wanted to revisit the instruction at the final jury instruction conference, and defense counsel responded, "No, Judge, I think we do need to admit this because there has been testimony about Mr. Holman touching a third party which is not charged and so I would say we need this instruction."

¶ 49 The jury ultimately found defendant guilty of aggravated criminal sexual assault (bodily harm) and guilty of criminal sexual assault, and not guilty of aggravated criminal sexual assault (dangerous weapon).

¶ 50 On September 26, 2024, defendant filed a motion for new trial. Defendant's motion argued that the trial court erred in admitting portions of defendant's interview with Grabowski into evidence. The motion also argued that the trial court erred in allowing defendant to be impeached by his prior convictions for armed violence and theft. Finally, the motion argued that the trial court should not have allowed J.W. to testify regarding defendant striking Wayne, because defendant was acquitted of battery and robbery in Wayne's case. The trial court denied defendant's motion on October 18, 2024, and sentenced defendant to 24 years' imprisonment. On November 13, 2024,

defendant filed a motion to reconsider sentence, which the trial court denied on February 26, 2025. Defendant timely appealed.

¶ 51                                    II. ANALYSIS

¶ 52    Defendant raises several issues on appeal. Broadly these issues fit into two categories. First, defendant argues that Grabowski's interview violated his right to silence and should not have been admitted. Second, defendant argues that defendant was prejudiced by the admission of evidence of other crimes or bad acts and that the jury instructions regarding the admission of this evidence were insufficient. Specifically, defendant argues that the trial court erred in admitting evidence that defendant struck Wayne unconscious where defendant had been acquitted of robbery and aggravated battery and that evidence had little relevance to the instant sexual assault. Defendant also argues that trial counsel was ineffective when it tendered an instruction that incorrectly stated the jury could consider defendant's conduct, the other crimes evidence, for propensity.

¶ 53                 A. Defendant's Right to Remain Silent was not Violated

¶ 54    In reviewing a ruling on a motion to suppress, the reviewing court generally applies a two-part standard of review whereby deference is given to the trial court's factual findings, which will be reversed only if they are against the manifest weight of the evidence, but the ultimate legal ruling on the motion to suppress is reviewed *de novo*. *People v. Hagestedt*, 2025 IL 130286, ¶ 14. However, in instances where the trial court did not hear any live testimony and only reviewed recordings of a defendant's interrogation, we are reviewing the same evidence as the trial court and therefore our review is entirely *de novo*. *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35. In the instant case, the trial court primarily reviewed a recording of the defendant's interrogation. However, Detective Grabowski also gave live testimony, clarifying some of the circumstances

surrounding the interrogation, such as the fact that defendant had not yet been charged in either Wayne's case or the instant case. Accordingly, we apply the typical two-part standard of review.

¶ 55    Defendant maintains that, shortly after Grabowski began questioning him about Wayne, defendant invoked his right to remain silent, which was not scrupulously honored by Grabowski, as he continued questioning defendant.

¶ 56    The fifth amendment includes the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966). "If a defendant indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id*. A defendant's right to cut off questions allows a defendant to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." (Internal quotations omitted.) *Id.* We must consider whether defendant invoked his right to remain silent and if so whether that request was scrupulously honored.

¶ 57    An invocation of the right to remain silent must be unambiguous and unequivocal, such that a reasonable officer under the circumstances would understand the statement to be an invocation of the suspect's right to remain silent, not merely a possible invocation. See *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (applying the standards for the invocation of the fifth amendment right to counsel to invocation of the right to remain silent); see also *Davis v. United States*, 512 U.S. 452, 459 (1994) ("But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not

require the cessation of questioning.").  When considering whether a defendant's invocation of his right to remain silent has been scrupulously honored,

> "courts should consider whether (1) the police immediately halted the initial interrogation after the defendant invoked his right to remain silent; (2) a significant amount of time elapsed between the interrogations; (3) a fresh set of *Miranda* warnings were given prior to the second interrogation; and (4) the second interrogation addressed a crime that was not the subject of the first interrogation." *People v. Nielson*, 187 Ill. 2d 271, 287 (1999).

¶ 58    Defendant maintains that he invoked his right to remain silent when he refused to answer Grabowski's questions regarding Wayne. We disagree. The right to end questioning is not invoked merely by a resistance to answering questions concerning particular details of an offense. *People v. Aldridge*, 79 Ill. 2d 87, 95 (1980).

¶ 59    The following was the exchange between Wayne and Grabowski from when he first refused to discuss the battery to Wayne to when Grabowski moved on to discuss the instant case:

> "Grabowski: So, tell me about that. Did you?—The night that you got into it with Wayne.
>
> Defendant: Who said there was a night?
>
> Grabowski: The people that I talked to.
>
> Defendant: I don't think I'll be talking to you about this.
>
> Grabowski: No?
>
> Defendant: No
>
> Grabowski: You don't want to say anything about that?
>
> Defendant: No

Grabowski: Alright. Did you get in a fight with Wayne? Or did you punch Wayne? Why don't you want to talk about this one? You're not in custody on this one.

Defendant: On this one what?

Grabowski: This case. This thing that I'm investigating.

Defendant: What is that?

Grabowski: A battery to Wayne.

Defendant: A battery to Wayne?

Grabowski: Yea. I was told that you punched Wayne in the face. Is that, is that not true?

Defendant: A battery to Wayne?

Grabowski: Mhmm.

Defendant: Wayne never said anything to me about him getting beat up.

Grabowski: No, because—because they say that you beat him up.

Defendant: No I'm not. I'm not even going to speak about that.

Grabowski: You're not going to tell me about that?

Defendant: No

Grabowski: OK. Piggy-backing off of that. So, I'm not going to ask you any questions about that incident with Wayne. But, is this—is this where Wayne lived?

Grabowski: Where he lived?

Defendant: Mhmm.

Grabowski: Did he stay in that—in that apartment?

Defendant: Why would you say, is that where he lived?

Grabowski: I'm asking you. You said you were—you knew him, you're friends with him. And now you don't want to talk about an incident.

Defendant: No, no. I'm saying—You're saying—Cause everything you're saying about him is past tense.

Grabowski: Mhmm. At the time that you knew him. You've been you've been in custody for over a month. So.

Defendant: I don't—I don't want even to get involved with that.

Grabowski: OK."

¶ 60    Reviewing defendant's statements to Grabowski, he never makes an unambiguous and unequivocal invocation of his right to remain silent. Every time defendant was asked a question he did not wish to answer his declination was specific to that question: "I don't think I'll be talking to you about *this*;" "I'm not even going to speak about *that*;" "I don't want even to get involved with *that*;" "I'm not even comfortable speaking about any of *that*." See *People v. Silva*, 45 Cal. 3d 604, 630 (1988) (finding that defendant's statement, "I don't know, I really don't want to talk about that[,]" was not a request to terminate interrogation).

¶ 61    Further, throughout that line of questioning, defendant is asking questions of Grabowski. While he clearly did not wish to speak on the topic of Wayne, he also was interested in finding out what Grabowski knew and did not seek to terminate the interrogation. In fact, defendant spoke freely with Grabowski for another hour. Additionally, on cross-examination, defendant was asked if he knew that he could choose not to speak to Grabowski, but chose to speak with him anyway and defendant answered, "yes."

¶ 62    As defendant did not invoke his right to remain silent during Grabowski's questioning regarding Wayne, his subsequent statements regarding the instant case were not obtained in

violation of his right to remain silent, and therefore the trial court did not err in denying the motion to suppress and admitting those statements into evidence.

¶ 63                    B. Other Crimes Evidence and Jury Instructions

¶ 64    Defendant raises several meritorious issues relating to the admission of other crimes evidence in the instant case, namely that the trial court erred in admitting other crimes evidence regarding defendant knocking Wayne unconscious and stealing his keys, trial counsel was ineffective for issuing the modified IPI Criminal No. 3.14, which instructed the jury to consider other crimes evidence for the purpose of propensity, and for failing to introduce a limiting instruction related to the admission of defendant's prior armed violence and theft convictions. As the prejudicial effect of these errors had a cumulative effect on the fairness of the trial, we save our discussion of prejudice for the end of this section.

¶ 65             1. Evidence Regarding the Battery to Wayne and Theft of his Keys

¶ 66    Defendant argues that the trial court erred in admitting evidence that defendant struck Wayne, knocked him out, and stole his keys, as this evidence was of limited probative value and unduly prejudicial. "Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 67    Illinois Rule of Evidence 404(b) (eff. Jan 1, 2011) prohibits the use of other crimes evidence to establish a defendant's propensity to have committed the charged crime, absent certain limited statutory exceptions. "In a criminal case, the rule operates to preclude the prosecution from introducing other acts by the defendant to show that he has a criminal propensity and therefore is

probably guilty of the crime charged." *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 12. However, "[o]ther-acts evidence, while typically inadmissible to prove propensity, may nonetheless still be admissible to prove some other point material to the controversy[.]" *Id.* ¶ 13. ("Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.").

¶ 68 In the instant case, the State sought to admit evidence of defendant striking Wayne to establish that J.W. feared defendant in order to explain why she did not leave defendant or go to the police sooner. "[L]ike all evidence, other-acts evidence offered for a permissible purpose may nonetheless be excluded under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) if its prejudicial effect substantially outweighs its probative value." *Mujkovic*, 2022 IL App (1st) 200717, ¶ 13. Additionally, in granting the State's motion to admit, the trial court also indicated that the continuing narrative exception applied.

¶ 69 To begin, we disagree with the trial court that the continuing narrative exception is applicable. "When facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes." *People v. Collette*, 217 Ill. App. 3d 465, 472 (1991). "In contrast, other-crimes evidence may not be admitted under the continuing-narrative exception, even when the crimes occur in close proximity, if the crimes are distinct and 'undertaken for different reasons at a different place at a separate time.' " *People v. Adkins*, 239 Ill. 2d 1, 33 (2010) (quoting *People v. Lindgren*, 79 Ill. 2d 129, 139-40 (1980)). While J.W. was unclear on precisely which night defendant sexually assaulted her, she was clear that it did not occur on the first night they stayed at Wayne's apartment. As such the two crimes were undertaken for different purposes (taking Wayne's keys versus defendant's sexual gratification), at a different place (under the

viaduct versus inside Wayne's apartment), and at separate times (either one or two days later). Accordingly, the continuing narrative exception was inapplicable.

¶ 70    Regarding the admission of the evidence on the ground that it helped to establish that J.W. feared defendant, the prejudicial effect substantially outweighed its probative value. There was already ample evidence in the record to support J.W.'s assertion that she did not attempt to leave defendant or go to the police immediately because she feared him. J.W.'s brutal account of defendant sexually assaulting her was more than sufficient to explain her fear of defendant. Her testimony was further bolstered by the photographs showing the extent of her injuries. Likewise, Officer Sullivan testified that J.W. became quiet and acted oddly when he asked about her injuries in defendant's presence. As more cumulative evidence is admitted, the probative value of that evidence decreases, while the prejudicial effect remains. *People v. Maya*, 2017 IL App (3d) 150079, ¶ 70. "In the context of other crimes or bad acts evidence, courts are especially wary of accumulation, given the high danger of undue prejudice inherent in such evidence." *Id.* ¶ 71.

¶ 71    Further, the State made little effort to confine its usage of the assault on Wayne to the purpose for which it was admitted. While examining J.W., the State did not ask J.W. whether witnessing the assault made her more fearful of defendant. In closing arguments, the prosecutor argued, "We know that the defendant, when he wants something, he takes it. He's willing to take keys from a passed out man and stay at his place." The argument is effectively a propensity argument: defendant is the type of person who does X, therefore he must have done Y.

¶ 72    Additionally, defendant had been found not guilty of aggravated battery and armed robbery in Wayne's case. The State is correct that other crimes evidence may still be admissible, even when a defendant has been acquitted of the other crimes. See *People v. Baldwin*, 2014 IL App (1st) 121725, ¶ 73 ("(T)he mere fact of acquittal does not necessarily mean that defendant did not

commit the alleged other offense; instead, it shows that the State was unable to prove every element of its case beyond a reasonable doubt."). However, trial courts should exercise caution regarding the admission of other crimes evidence for which the defendant has been acquitted, as the risk of undue prejudice, confusion, and causing a trial-within-a-trial are all increased. See *People v. Ward*, 2011 IL 108690, ¶ 48 ("Because the proper application of the balancing test firmly establishes the serious risk of undue prejudice to defendant created by the admission of the other-crimes evidence in the absence of any acquittal evidence, the risk of misleading or overpersuading the jury is palpable." (Internal quotation marks omitted.)) Also, an acquittal is less probative than a conviction.

¶ 73    Accordingly, we find that the trial court abused its discretion by admitting evidence regarding defendant knocking Wayne unconscious and taking his keys.

¶ 74         2. Propensity Instruction Fell Below Objective Standard of Reasonableness

¶ 75    What *does overcome that presumption of trial strategy* is trial counsel's baffling decision to introduce an instruction which stated that the jury could consider the other crimes evidence for the purpose of propensity. To assert a claim of ineffective assistance of counsel, a defendant must establish that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 34. "The ultimate question of whether counsel's actions support a claim for ineffective assistance of counsel is subject to *de novo* review on appeal." *People v. Davis*, 2023 IL App (1st) 220231, ¶ 28.

¶ 76    The State maintains that trial counsel's decision to give the modified IPI Criminal No. 3.14 constitutes invited error and should be precluded from review. The State further maintains that the decision to give the instruction falls within the realm of sound trial strategy. We disagree.

¶ 77    Although the State is correct that invited error will preclude plain-error review, it does not preclude a claim of ineffective assistance of counsel. "Where the defendant invited the error, our supreme court has declined to address any related plain-error claim." *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 77 (citing *People v. Patrick*, 233 Ill. 2d 62 (2009)). However, invited error does not preclude a defendant from raising a claim of ineffective assistance of counsel on the same issue. See *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 210 ("The doctrine of invited error blocks defendant from raising this issue on appeal, absent ineffective assistance of counsel.").

¶ 78    Regarding the State's claim that trial counsel's decision to include propensity in the instruction constitutes trial strategy, the State utterly fails to explain how adding propensity to IPI Criminal No. 3.14 could have possibly benefited defendant. The State tries to claim that because defendant testified to certain bad acts, such as using cocaine and fighting with the Mexican man, somehow it behooved him to instruct the jury to consider this conduct for his propensity to commit the charged crimes. As the court stated so clearly in *People v. Potts*, 2021 IL App (1st) 161219, ¶ 190:

> "We can say this much with certainty: the reference to 'the defendant's propensity' should not have been included in IPI Criminal 4th No. 3.14. It did not belong there. It never does. The whole point of giving IPI Criminal 4th No. 3.14 is to *prevent* the jury from doing exactly that—considering evidence for the purposes of propensity—by listing the exclusive, *non*-propensity purpose(s) for which the jury may consider the other-crimes

evidence. Allowing the jury to consider propensity under IPI Criminal 4th No. 3.14 defeats the whole point of the limiting instruction." (Emphasis in original.) *Id.*

¶ 79    "As our courts have long recognized, jurors tend to find propensity evidence overly persuasive and to give it too much weight, prompting them to prejudge defendants based on their generally bad records." *Ward*, 2011 IL 108690, ¶ 47. The purpose of IPI Criminal No. 3.14 is to curtail the likelihood that the jury will consider other crimes evidence for the improper purpose of propensity. See *People v. Denny*, 241 Ill. App. 3d 345, 360-61 (1993) ("Because of the significant prejudice to a defendant's case that the admission of other crimes evidence usually risks, we hold that trial courts should not only instruct the jury in accordance with IPI Criminal 2d No. 3.14 at the close of the case, but also orally from the bench (unless defendant objects) at the time the evidence is first presented to the jury."); Illinois Pattern Jury Instructions, Criminal, No 3.14, Committee Comments (approved Oct. 17, 2014) ("At the time the evidence which is the subject of this instruction is first presented to the jury, the Committee recommends that an oral instruction should be given to explain to the jury the limited purpose of this evidence, unless the defendant objects to that instruction.")

¶ 80    By tendering a version of IPI Criminal No. 3.14, that explicitly said  the jury could consider the other crimes evidence for propensity, not only did trial counsel defeat the entire purpose of the instruction, he actively invited the jury to consider the other crimes evidence for the purpose of propensity. It would have been better to give no instruction at all. In short, the first *Strickland* prong was satisfied. See *Potts*, 2021 IL App (1st) 161219, ¶ 193 ("[C]ounsel had no valid strategic reason to let the reference to 'propensity' stand. It was not required by the pattern instruction; it was basically the opposite of a limiting instruction, and it could only hurt defendant. Counsel's

failure to object to the defective instruction, or to tender an adequate one, was deficient performance.").

¶ 81                    3. Erroneous Propensity Instruction Affected Prior Convictions.

¶ 82    Finally, defendant argues that he received ineffective assistance of counsel when trial counsel failed to tender the Illinois Pattern Jury Instructions, Criminal, No. 3.13 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.13) limiting instruction for defendant's prior theft and armed violence convictions which were being admitted as impeachment evidence. The issue was made worse by the fact that the modified version of IPI Criminal No. 3.14 did not specify to which "conduct" it applied. In response the State maintains that the record regarding trial counsel's failure to tender IPI Criminal No. 3.13 is undeveloped and should be precluded from review. Alternatively, the State maintains that the failure to tender IPI Criminal No. 3.13 should be viewed as a strategic choice of not wanting to draw attention to defendant's prior convictions. The State also notes that in closing argument the prosecutor told the jury that defendant's prior convictions for theft and armed violence could be considered "in weighing the credibility of the defendant."

¶ 83    The State's arguments may have been compelling were it not for the fact that defense counsel tendered the modified IPI Criminal No. 3.14. It is true that the failure to tender a limiting instruction on the usage of other crimes evidence may sometimes be considered a valid strategic decision in order to avoid emphasizing that evidence. See *People v. Jackson*, 391 Ill. App. 3d 11, 34 (2009) ("Defense counsel's choice not to seek a limiting instruction regarding other crimes evidence was purely a strategic decision made so as not to emphasize the evidence which, while proper, portrayed defendant in a bad light.").

¶ 84    However, because the modified IPI Criminal No. 3.14 was the only jury instruction given regarding the purpose for which the other crimes evidence could be admitted, and it was not

specific as to what "conduct" it applied to, the jury was effectively instructed that it could consider all of the other crimes evidence for propensity purposes. See *Potts*, 2021 IL App (1st) 161219, ¶ 192. In *Potts*, the jury heard evidence of various instances of other crimes which were admitted for various different purposes, including allegations of domestic violence which could be considered for the defendant's propensity to commit murder. *Potts*, 2021 IL App (1st) 161219, ¶ 188. As in the instant case, the jury in *Potts* was given a modified IPI Criminal No. 3.14 which included propensity and which did not specify to which of the other crimes evidence it applied. *Potts*, 2021 IL App (1st) 161219, ¶ 181.

¶ 85 While trial counsel's failure to tender an IPI Criminal No. 3.13 limiting instruction may under normal circumstances be considered a matter of the trial strategy, when combined with the introduction of the modified IPI Criminal No. 3.14 propensity instruction, the effect was one "which could only hurt defendant." *Id.* ¶ 193. This likewise satisfies *Strickland's* first prong.

¶ 86                    4. Cumulative Errors Constitute Reversible Error

¶ 87 As mentioned at the beginning of our discussion regarding other crimes evidence, the multiple errors in the admission of other crimes evidence had a cumulative effect and should be considered as a whole to determine whether reversal is warranted. The evidence regarding defendant striking Wayne was admitted for an improper purpose and was unduly prejudicial, thus posing a risk that a jury would convict defendant not because he committed the charged conduct, but because he was a "bad person deserving of punishment." *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). This risk was compounded by the fact that the jury was specifically instructed to consider defendant's conduct for its propensity. "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49. That risk was then multiplied by the introduction of defendant's

prior convictions for theft and armed violence, regarding which the jury was also effectively instructed to consider for their propensity.

¶ 88    "[W]hile individual trial errors may not require a reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial." *People v. Speight*, 153 Ill. 2d 365, 376 (1992). "Regarding the second *Strickland* prong, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004) "In making a determination of whether the evidence is closely balanced, a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case." *People v. Belknap*, 2014 IL 117094, ¶ 52.

¶ 89    The instant case ultimately hinged upon the credibility of J.W. versus that of defendant. While J.W.'s testimony was corroborated in several respects, including her physical injuries, there were also aspects which impugned her credibility. J.W. admitted to drinking heavily during the days she and defendant were together and got confused regarding precisely when the assault occurred. That being said, there were also aspects of defendant's testimony which were implausible, such as his explanation regarding J.W.'s injuries and the circumstances regarding how they came to be at Wayne's apartment. Further, the jury found defendant not guilty of aggravated criminal sexual assault (dangerous weapon), despite J.W.'s testimony that defendant threatened her with a knife during the assault. See *People v. Delgado*, 376 Ill. App. 3d 307, 311-12 (2007) (finding of not guilty on criminal sexual assault charge, despite victim's testimony that the defendant committed an act of sexual penetration, was a factor in finding the evidence to be closely balanced on the defendant's conviction for aggravated criminal sexual abuse). Taken together, the

errors in this case call into question the overall fairness of the trial, where the jury was told that they could consider defendant's unrelated prior actions for his propensity to commit the current crime, especially in light of the fact that defendant had been tried and found not guilty regarding some of the alleged misconduct. Accordingly, we reverse and remand for a new trial.

¶ 90                                    III. CONCLUSION

¶ 91    For the reasons stated, we reverse the judgment of the circuit court of Kane County and remand for a new trial.

¶ 92    Reversed and remanded.